UNITED STATES of America, Plaintiff,

v.

LOCAL 1804–1, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, et al., Defendant.

Donald CARSON and Peggy Carson, Plaintiffs,

v.

LOCAL 1588, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, its Officers, Executive Board, and Trustees, et al., Defendants.

Nos. 90 Civ. 0963 (LBS), 90 Civ. 5618 (LBS).

United States District Court, S.D. New York.

Aug. 19, 1993.

Mary Jo White, U.S. Atty. S.D.N.Y., New York City (Claude M. Millman, Aimee B. Wolfson, Asst. U.S. Attys., of counsel), for U.S.

Fredric J. Gross Law Firm, Mount Ephraim, NJ (Fredric J. Gross, of counsel), for Donald Carson.

Anthony Gallagher, pro se.

Freeman, Nooter & Ginsberg, New York City (Lou Freeman, of counsel), for George Lachnicht.

Goldman & Hafetz, New York City (Frederick P. Hafetz, Susan R. Necheles, of counsel), for Venero Mangano.

Donna Newman, Jersey City, NJ, for ILA Locals 1588.

SAND, District Judge.

Having previously determined that the four remaining defendants in this action—Donald Carson, Anthony Gallagher, George Lachnicht, and Venero Mangano—were liable to the government for violations of the civil RICO statute, 18 U.S.C. § 1962(c), the Court now turns to the remedy phase of this litigation. *See United States v. Local 1804–1, Int'l Longshoremen's Ass'n,* 812 F.Supp. 1303 (S.D.N.Y.1993) (the "Liability Opinion"), *modified, United States v. Local 1804–1, Int'l Longshoremen's Ass'n,* 831 F.Supp. 167 (1993) (the "Rule 52(b) Opinion"). In Part I of this Opinion, the Court will consider whether further evidence should be received in connection with the remedy phase of this lawsuit. After concluding that there is no need to receive further evidence, the Court will address, in Part II, the remedy to which the government is entitled in light of this Court's liability findings. In Part II the Court will also address defendant Venero Mangano's request to exempt his attorney's fees from any remedy award ordered by this Court. *See United States v. Local 1804–1, Int'l Longshoremen's Ass'n,* 90 Civ. 963 (LBS), 1993 WL 77319 at *8 n. 1. (March 15, 1993) (the "Asset Restraint Opinion") (reserving decision on whether Mangano's attorney's fees should be exempted from Asset Restraining Order). Finally, in Part III, the Court will address defendant Anthony Gallagher's request to proceed with his appeal *in forma pauperis.*

Familiarity with the Court's previous Opinions in this case—including the Liability

Opinion, the Asset Restraint Opinion, and the Rule 52(b) Opinion—is assumed.

# I.

## THE APPROPRIATENESS OF FURTHER EVIDENTIARY PROCEEDINGS

· The first issue this Court must address is whether the defendants should be permitted to submit further evidence in connection with the remedy phase of this action. By Order dated March 29, 1993, the parties were instructed to submit to the Court a list of the testimony and evidence they proposed to introduce, if the Court were to conduct further proceedings. In that Order the Court reminded the parties that "the only matter that would be at issue in such [further proceedings] would be the relief to which the government is entitled in light of this Court's liability findings."[1] In response, Donald Carson and Anthony Gallagher wrote letters to the Court listing those witnesses they would propose to·call and documents they would seek to introduce during the remedy phase. We will briefly go through the requests. We conclude, however, that no further evidentiary proceedings are required at this time.[2]

### A. *Carson's List of Proposed Witnesses*

■ 1. Carson proposes to call six witnesses—including two former federal district judges and a former federal prosecutor—and to introduce numerous documents to support his claim of entitlement to an "equitable offset of all losses proximately caused by the government's violations under the Fourth Amendment and/or Title III." Letter to the Court from Fredric J. Gross, Attorney for

Donald Carson, dated April 6, 1993 ("Carson's Letter") at 2. Carson has previously calculated the value of such an offset at approximately one million dollars. *See* Brief for Donald Carson in Opposition to Freeze of Assets at 4. We conclude that Carson's claim of entitlement to an equitable offset is completely without merit, for many reasons, including sovereign immunity, statutory immunity, *see* 18 U.S.C. § 2520(d)(1) (good faith reliance on court warrant or order is a "complete defense" against any claim for damages for violation of wiretapping statute), and laches. Accordingly, Carson's request to offer evidence pertaining to these issues is denied.

■ 2. Carson proposes to call three of the Assistant United States Attorneys assigned to this action to prove that the Government is "seeking recovery on behalf of others," which Carson contends violates Fed. R.Civ.P. 17(a) and Article III of the United States Constitution. Carson's Letter at 2. While disputing Carson's view of the law, the government concedes that it "seeks to restore ill-gotten gains to the defendants' victims and that a portion of the proceeds may be deposited into the United States Treasury." Letter to the Court from Claude Millman, Assistant United States Attorney, dated April 21, 1993 ("Govt. Letter") at 3. The government also concedes that it seeks to impose the costs of all court-appointed officers on the defendants. *Id.* The defendants have had notice that this was the government's intent from the outset of this litigation. *See* Amended Complaint at 123–24. Since the disagreement between Carson and the government involves a pure question of

---

1. In addition, a letter from the Court to Gallagher contained the following warning:
   > [Y]ou state in your April 25, 1993 letter that "[t]he court must accept that liability and remedy are inexorably intertwined." You are specifically instructed that any papers submitted to the Court *must* separate the issues of liability and remedy or else the Court will not consider them. In other words, for the purposes of the remedy phase, you must accept as correct the findings of fact and conclusions of law set forth in this Court's Liability Opinion.
   Letter from the Court to Mr. Anthony Gallagher, dated May 4, 1993, at 1–2. Defendant Carson was sent a copy of this letter.

2. Defendant Mangano has not requested to introduce further evidence in connection with the remedy phase. Defendant Lachnicht has entered into a stipulation with the Government, which was approved by the Court, whereby he withdrew his request that the Court receive additional evidence during the remedy phase of this action. Lachnicht also stipulated as to certain dollar amounts that Lachnicht received as salary from PSN during certain years. We will discuss this stipulation in Part II.A.3, *infra.*

law, there is no need to receive any evidence pertaining to these issues.

■ Turning to the question of law, we conclude that Carson's argument that the government is attempting to assert the rights of third parties in violation of Fed. R.Civ.P. 17(a) and Article III of the United States Constitution must be rejected as meritless.[3] The mere fact that certain victims of the defendants' racketeering acts may receive partial restitution as a result of the government's prosecution of this case does not mean that the government has brought this suit on behalf of the victims. On the contrary, the government brought this action to vindicate its own interest in ensuring that the RICO statute is enforced. The Attorney General, who is empowered to bring actions on behalf of the United States, 28 U.S.C. § 516, is authorized to "institute proceedings under" the civil RICO statute. 18 U.S.C. § 1964(b). Carson's argument must be rejected as meritless.

■ 3. Carson also proposes to call the Clerk of the United States District of New Jersey, presumably to authenticate various documents from the DiGilio criminal case, to support his claim that the government is barred from obtaining monetary relief by the Double Jeopardy Clause of the United States Constitution. Since these documents have already been admitted in evidence in this case, and since the government does not dispute their authenticity, see Govt. Letter at 4, Carson's request is denied. The Court also denies Carson's request to call three of the Assistant United States Attorneys assigned to this action in connection with his double jeopardy claim. The Court addresses Carson's double jeopardy argument in Part II.A.5 of this Opinion.

■ 4. In this Court's Liability Opinion, we held that Carson violated the Taft–Hartley Act by accepting meals and entertainment from employers of ILA labor. See Liability Opinion, 812 F.Supp. at 1328. Since the government "is not seeking restitution with respect to the meals and entertain-

ment," Govt. Letter at 4, there is no need to receive any further evidence with regard to Carson's claim that the receipt of these meals yielded no personal benefit to Carson.

■ 5. Since the Court withdraw its finding that Carson embezzled expenses from Local 1588, see Rule 52(b) Opinion, at 175, there is not need to hear any further testimony with regard to Carson's expenses. Accordingly, Carson's request to offer evidence regarding whether the union local would have disapproved of Carson's expenses is denied as moot.

■ 6. Carson asks to present evidence that he claims would demonstrate that Sealand saved money from the MOTBY mixed-labor contract. The government does not dispute that Sealand saved money when it moved its operations from Port Newark to MOTBY due to increased security and employee productivity. Govt. Letter at 5–6. However, the dispositive issue is not whether Sealand saved money after it moved to MOTBY; the dispositive issue is whether UTI billed Sealand at the higher longshoremen rate when it only provided Sealand with a mixed-labor force. Indeed, if the MOTBY participants had not defrauded Sealand by charging the higher longshoremen rate, but instead had reduced the amount charged to account for labor savings resulting from the use of mixed-labor, Sealand would have saved even more money.

This issue is irrelevant. Accordingly, there is no need for further evidence with regard to this issue.

■ 7. Carson proposes to present evidence that he claims will demonstrate: (1) that Local 1588's treasury was not harmed, but actually benefited from the mixed labor contract at MOTBY; (2) that all salaries were approved at general membership meetings of Local 1588; and (3) that Carson rendered services to the union in return for his salary. These are matters that go to the heart of the Court's liability findings and are outside the parameters that have been set by this Court for the remedial phase of this

---

**3.** Fed.R.Civ.P. 17(a) provides that "[e]very action shall be prosecuted in the name of the real party in interest."

litigation. Carson had an opportunity to, and to some extent did, present evidence concerning these issues during the liability trial. We will not afford him an opportunity to relitigate these issues at this late stage in the proceedings. *See also* Rule 52(b) Opinion, at 175 (rejecting Carson's attempt, through Rule 52(b), to revisit same issues).

■ 8. Carson proposes to present evidence concerning the value of the services he provided to the union. Carson also proposes to present evidence regarding how much he paid in taxes and union dues during the relevant periods as a potential offset if the Court were to order disgorgement of his salary. We believe that the size of the disgorgement award ordered by this Court obviates a need for further evidentiary hearings on these issues. *See* Part II.A.2, *infra*. If the Court is mistaken in this belief, the parties are instructed to inform the Court that such is the case promptly upon receipt of this Opinion.

■ 9. Finally, Carson would also like to present evidence concerning his claim of entitlement to an offset in the amount of sums expended on his attorneys fees incurred during his criminal trial and appeal. This request is frivolous, and therefore is denied.[4]

### B. *Gallagher's Proposed List*

■ Gallagher has submitted a list of documents he would like to introduce, and witnesses he would like to call, during the remedy phase of this action. Much of the evidence that Gallagher would like to introduce appears to relate to his claim that Sealand profited by moving from Port Newark to MOTBY. An even greater portion of the

evidence he wishes to introduce relates to the soundness of this Court's Liability Opinion. Frankly, it is difficult to discern from Gallagher's submissions his purpose for calling a number of the witnesses he proposes to call and for introducing a number of the documents he wishes to introduce. After reviewing Gallagher's submissions, we conclude that Gallagher has not proposed to introduce any relevant evidence probative of disputed issues pertaining to the appropriate remedy to which the government is entitled in light of this Court's determination of liability against Gallagher. Gallagher was specifically instructed by the Court that he would not be allowed to relitigate issues of liability during the remedy phase.[5] Accordingly, Gallagher's request to call the witnesses and to introduce exhibits set forth in his submissions to the Court is denied.[6]

## II.

### THE REMEDY TO WHICH THE GOVERNMENT IS ENTITLED

We turn next to the specific relief sought by the government against each individual defendant in light of the liability findings made by this Court. In Part A we will address the government's request for monetary relief against Carson, Gallagher, Lachnicht, and Mangano. In Part B, we will address the government's request for injunctive relief against these defendants.[7]

### A. Monetary Relief

1. *The MOTBY Scheme: Carson, Gallagher, and Mangano*

■ Relying on Judge Glasser's thorough opinion in *United States v. Bonanno*

---

4. In the Asset Restraint Opinion, this Court ordered that the check refunding Donald Carson's criminal fine be placed in escrow pending a determination of whether the proceeds belong to Donald Carson or his wife Peggy Carson. Asset Restraint Opinion, 1993 WL 77319 at *5. This matter has been referred to United States Magistrate Judge Dolinger who will hold an evidentiary hearing exploring this issue in the near future. The resolution of this issue has no bearing on the government's entitlement to relief, though it may effect the government's ability ultimately to enforce a judgment.

5. *See* note 1, *supra*.

6. This is subject to a caveat: some of the documents that Gallagher proposes to rely on during the remedy phase of this litigation are already part of the record before the Court. *E.g.*, GX 733 DIG; Gallagher Exhibits NOP–2; GX 811 A DIG; GX 300A–363A DIG; UTI–Sealand Correspondence; Carson Ex. 2; GX 128CC DIG; GX 4055A–B; GX 4088–89. Obviously, Gallagher may rely on those exhibits.

7. In a separate Order issued today, this Court addresses the relief to which the government is entitled with respect to those defendants who have defaulted in this action.

*Organized Crime Family,* 683 F.Supp. 1411, 1442–49 (E.D.N.Y.1988), *aff'd,* 879 F.2d 20 (2d Cir.1989), this Court concluded that § 1964(a) bestows upon the Court "broad equitable powers" and that the "government may seek, pursuant.to § 1964, disgorgement of the defendants' ill-gotten gains resulting from participation in a RICO enterprise in violation of § 1962(c)." Asset Restraint Opinion, 1993 WL 77319 at *3. As Judge Glasser noted:

> The authority to order disgorgement derives from the broad equitable powers given courts under the securities laws 'to provide such remedies as are necessary to make effective the congressional purpose.' *J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). The fashioning of equitable remedies under the securities laws lies within the 'sound discretion' of the court. *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 386, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1964). A court exercising the broad equitable powers of RICO's § 1964 has similar, if not wider, latitude in designing appropriate relief.

*Bonanno,* 683 F.Supp. at 1448. Of course, to obtain a disgorgement award, the government must demonstrate that the proceeds sought to be disgorged were ill-gotten under the RICO statute. Asset Restraint Opinion, 1993 WL 77319 at *4; *Bonanno,* 683 F.Supp. at 1449.

■ We reserved decision on whether the government could obtain the remedy of "restitution" under § 1964. Asset Restraint Opinion, 1993 WL 77319 at *4. We conclude today that § 1964 vests the district courts with the power to order restitution. Restitution is a remedy, historically available in equity, "by which [the] defendant is made to disgorge ill-gotten gains or to restore the status quo, or to accomplish both objectives." *Securities & Exchange Comm'n v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 95 (2d Cir.1978) (citation omitted). The availability to the government of the remedy of restitution follows from the broad equitable powers bestowed upon the federal courts by § 1964, *see Bonanno,* 683 F.Supp. at 1448, and is not seriously disputed by the parties.

However, the parties dispute the permissible scope of an award of restitution or disgorgement. It is the government's position that the Court has the power to order that each individual defendant pay restitution to the victims of the MOTBY scheme in the full amount of the loss suffered by the victims regardless of the amount of ill-gotten gains that defendant actually received. This position dovetails with the government's argument that the Court is empowered under § 1964 to order the defendants to disgorge, on a theory of joint and several liability, the amount of the ill-gotten gains received by *all* the participants in the MOTBY scheme. Based on this Court's finding that UTI saved $546,000 during the operation of the MOTBY scheme (the "MOTBY profits"), *see* Liability Opinion, 812 F.Supp. at 1320, the government asks this Court to award restitution from Carson, Gallagher, and Mangano in this amount, with prejudgment interest. The government also requests that the Court order that an equitable lien arose against Carson for $16,100, Mangano for $16,100, and Gallagher for $175,800, as of October 1, 1982.

■ We need not address the thorny question of whether the Court is empowered under the remedial provisions of the civil RICO statute to order "joint and several" disgorgement or full restitution against any of the individual defendants, regardless of the portion of ill-gotten sums received by the defendant in question. *But see United States v. Local 295, Int'l Brotherhood of Teamsters,* 90 CV 0970, 1991 WL 128563 at *1 (E.D.N.Y. June 28, 1991) (disgorgement under § 1964 not available on joint and several basis). For, even assuming arguendo that the Court is vested with such power, the Court would not, on the facts before it, exercise that power. Sitting in equity, this Court must balance several factors when fashioning relief. Upon such a balancing, we conclude that the remedy to which the government is entitled is a disgorgement award in an amount that approximates the amount that each of the defendants actually received. We will briefly state some of the factors that compel us to reach this conclusion.

First, we note that the government is seeking to hold the defendants liable for a

sum which exceeds, at least in the cases of Carson and Mangano, the amount actually received by each defendant by sixty times. It is the opinion of the Court that this amount is excessive. Second, more than a decade has passed since the MOTBY scheme occurred. Indeed, the individual members of Local 1588, who were the principal victims of the MOTBY scheme, would be time-barred from bringing suit for damages on the theory and in the amount now advanced by the government. *See Agency Holding Corp. v. Malley–Duff & Assoc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987) (four year statute of limitations governs private civil RICO damage suits).[8] Third, as we have previously noted, when fashioning an equitable remedy it is appropriate to consider "the likelihood of future racketeering activity on the part of the defendants." Asset Restraint Opinion, 1993 WL 77319 at *3. Given the advanced age of the three defendants, and the fact that a sentence has been imposed on Mangano which will likely result in his spending the remainder of his life behind bars, the likelihood of the commission of similar illegal acts by the defendants in the future is not overwhelming. The likelihood that the defendants will engage in racketeering acts in the future is also diminished by the injunctive relief granted by the Court. *See* Part II.B., *infra.* Fourth, we note that the MOTBY scheme was of relatively short duration; indeed, it lasted just over one year. The part played by the MOTBY scheme in casting the pall of organized crime over the New York/New Jersey waterfront is relatively small.[9]

We turn next, therefore, to a determination of the remedial relief to which the government is entitled against each defendant.

### a. *Donald Carson*

■ In this Court's Liability Opinion, defendant Donald Carson was found to have committed multiple violations of the Taft–Hartley Act, 29 U.S.C. § 186(b), by receiving payments from UTI, in the form of kickbacks, in the amount of $5 per container stripped.[10] *See* Liability Opinion, 812 F.Supp. at 1326. Since 3220 containers were stripped during the operation of the MOTBY operation, *see* Tr. at 3879, 3890 (Ruffino), and since Carson's share of the kickbacks was $5 per container stripped, we conclude that Carson received a total of $16,100. Carson is hereby ordered to disgorge $16,100.

### b. *Venero Mangano*

■ This Court found that Mangano aided and abetted Carson's multiple violations of the Taft–Hartley Act. Liability Opinion, 812 F.Supp. at 1327.

As a preliminary matter, Mangano objects to the admission of Gallagher's criminal testimony against him during the remedy phase of this action, on the grounds that the testimony is hearsay as against him and on the theory that it was derived from electronic surveillance tapes which were suppressed because the government, in violation of the federal wiretapping statute, failed to seal the tapes in a timely fashion. Mangano made these same objections with regard to the admission of the same evidence during the liability phase, which this Court rejected. *See* Rule 52(b) Opinion, at 171–73; Liability Opinion, 812 F.Supp. at 1323. For the reasons set forth in the Rule 52(b) Opinion, we reject Mangano's objections to this evidence during the remedy phase. This case has proceeded on the understanding that the record for the purposes of the remedy phase would be the record established during the liability phase. Since the Gallagher confession has been properly admitted into the record, and since it was relied upon to sup-

---

8. We recognize that the four year statute of limitations and laches are not applicable against the United States. *See United States v. Private Sanitation Indus. Ass'n*, 793 F.Supp. 1114, 1152 (E.D.N.Y.1992).

9. In an Order simultaneously issued by this Court today, we award restitution from certain defaulting defendants on a joint and several basis. We do this because the factual allegations in

the complaint, which we must accept as true in light of the defaults, reflect a higher degree of culpability and involvement in the Waterfront criminal enterprise on the part of the defaulting defendants.

10. For a detailed description of the MOTBY scheme, *see* Liability Opinion, 812 F.Supp. at 1318–27.

port the liability findings, it would be absurd to allow suppression of this evidence during the remedy phase. Mangano's request to suppress the Gallagher confession during the remedy phase is denied.

■ In this Court's Liability Opinion, we held that Mangano made a division of $25 a container, and that Mangano, Carson, and others each received $5 shares. Mangano claims that the Gallagher confession indicates that he and DiGilio divided $5 per container move.[11] On this basis, Mangano contends that the evidence in the record demonstrates that he received only $2.50 per container move. Although we acknowledge that Gallagher's testimony is ambiguous as to whether Mangano *retained* a full $5 per each container move, we conclude that there is no doubt that Mangano *received* a full $5 per each container move. The fact that Mangano ultimately may have "take[n] care of" DiGilio by sharing with him a portion of the MOTBY kickbacks he received is irrelevant. Moreover Mangano failed to present evidence during the liability phase, or to request, by the Court-imposed deadline, to present evidence during the remedy phase, which would indicate what portion, if any, of the $5 went to DiGilio.

Therefore, since 3220 containers were stripped during the MOTBY operation, and since Mangano's share of the kickbacks was $5 per container stripped, the evidence in the record supports the conclusion that Mangano received a total of $16,100. Mangano is ordered to disgorge this amount.

■ This Court previously reserved decision as to whether Mangano's attorney's fees should be exempted from the Temporary Restraining Order issued by this Court on March 15, 1993. *See* Asset Restraint Opinion, 1993 WL 77319 at *8 n. 1. Of course the restraining order is in effect now, and will remain in effect until such time as Mangano has disgorged the $16,100 in accordance with this Opinion. In light of the Opinion issued today, we deny Mangano's application for an exemption from the temporary restraining order. Nor will we exempt his attorney's fees from the disgorgement award we issue today.

### c. Anthony Gallagher

■ This Court found that Gallagher aided and abetted Carson's multiple violations of the Taft–Hartley Act.[12] Liability Opinion, 812 F.Supp. at 1327.

Although this Court held that Gallagher's company, B & A Reefer, siphoned $175,800 out of UTI, a great portion of that amount went to other participants in the MOTBY scheme. For example, $80,500 went to Carson, Mangano, and others. The government acknowledges that "[t]ens of thousands of dollars were distributed by Gallagher as 'longshoremen extras' to foremen and other longshoremen supervisors to persuade them not to disclose the scheme." Govt.'s Reply Mem. of Law in Support of its Request for Remedial Relief at 55. This Court has not made a finding of the exact amount retained by Gallagher as a result of his participation in the MOTBY scheme. Although the Court cannot exactly quantify the amount that Gallagher retained, given the state of the record, it certainly was far less than $175,-800. Just as certainly, Gallagher retained a healthy portion of the kickbacks. In the very least, Gallagher received the same amount that Carson and Mangano received: $16,100.

Accordingly, in the exercise of this Court's equitable discretion, we conclude that Galla-

---

11. The ambiguous portion of Gallagher's criminal testimony concerns the following question. The "Macey" referred to is John DiGilio.

Q. [Y]ou said: "So Benny made a division. $10 to Newark. $5 to Mike Losito. *$5 to him and Macey* and I should give $5 to Donald Carson, and tell Donald don't give anything to Macey. *I'll take care of him.*"
The Benny that you talked about there was Benny Mangano. Isn't that true Mr. Gallagher?
A. Yes, sir.

GX 5592A at 9772 (emphasis added).

12. We reject Gallagher's contention that the kickbacks the defendants actually received from the MOTBY scheme "cannot be defined." Gallagher Letter–Brief at 3. Gallagher's other proposed findings of fact in conjunction with the remedy phase of this litigation, including the various exhibits submitted by him, are irrelevant to the task before the Court, and are accordingly rejected.

gher should be ordered to disgorge only $16,-100, although the evidence in the record supports the reasonable inference that Gallagher received and retained a sum in excess of this amount.

### d. *Government's Request for Prejudgment Interest and Equitable Lien*

■ Finally, in the exercise of this Court's discretion under § 1964, we deny the government's request for an Order that equitable liens arose against Carson, Gallagher, and Mangano in the amounts ordered disgorged today as of October 1, 1982. In the exercise of this Court's equitable discretion, we also deny the government's request for prejudgment interest.

### 2. *Disgorgement of Carson's Salary*

■ In the Liability Opinion, this Court held that Carson embezzled a full-time salary from Local 1588, after he became a part-time officer, because the union membership did not approve the retention by Carson of a full-time salary after he became a part-time officer, and because he had the requisite intent to embezzle. Although we adhere to our finding that Carson did "precious little" for the union, it is undisputed that Carson performed *some* services for the union. Obviously, those services have an economic value. In other words, Carson was entitled to a part-time salary to compensate him for his services as a part-time officer. Therefore the amount that Carson embezzled from the Local is the difference between the full-time salary he received and the part-time salary he should have received, with the union's approval, as a part-time officer.

The government implicitly recognizes this, because it seeks a disgorgement award of only 80% of Carson's full-time salary. The government extracts that number from the fact that the Court credited testimony that Carson spent 80% of his time in New York after he was elected General Organizer of the ILA International. Carson responds by arguing that he "devoted more than 40% of the average workweek to local matters." Carson Mem. at 19. He also argues that his "level of responsibility for local matters did not de-crease with the reduction in pay and hours." *Id.* These contentions contradict this Court's findings of fact. *See* Liability Opinion, 812 F.Supp. at 1329–31.

Although the state of the record does not permit the Court to calculate the exact amount that Carson embezzled from the union as salary, we believe that an evidentiary hearing exploring this issue might well prove to be a waste of the parties' and this Court's time in light of the disgorgement award this Court, in the exercise of its discretion, is prepared to order. After balancing the equities involved, it is this Court's opinion that Carson should be required to disgorge 20% of the salary he received during the relevant years. This percentage is deliberately chosen since it would appear to be an amount which the government should have little difficulty establishing if further proceedings were held. If any party believes that this percentage is inappropriate *and* the matter is worth pursuing, the Court will arrange for further proceedings to be conducted.

The evidence in the record demonstrates that between 1982–1988 Carson received as salary the following amounts:

| Year | Salary |
|------|--------|
| 1982 | $51,395 |
| 1983 | 48,200 |
| 1984 | 48,900 |
| 1985 | 48,900 |
| 1986 | 48,785 |
| 1987 | 49,400 |
| 1988 | 22,200 |

GX 4175–82

The salary for those years totals over $300,000. Rounding off the numbers, this Court orders that Carson disgorge $60,000. The government's request for prejudgment interest and for an order that an equitable lien arose against Carson for this sum is denied in the exercise of this Court's equitable discretion under § 1964.

In light of this ruling, there is no need for the Court to receive any evidence regarding the value of the services Carson provided to Local 1588.[13]

13. The government also seeks an order requiring

Carson to disgorge the various expenses this

### 3. *George Lachnicht's "No–Show" Job*

In this Court's Liability Opinion, defendant George Lachnicht was held to have committed the following predicate acts (among others): (1) a Hobbs Act extortion of his "no-show" job from PSN; (2) violations of the Taft–Hartley Act by accepting various things of value from his employer; (3) aiding and abetting Tom Bruno's Hobbs Act extortion of Bruno's "no-show" job; (4) aiding and abetting multiple violations of the Taft–Hartley Act in connection of the "no-show" jobs of Tom Bruno, Jackie Bruno, and Richard DeSciscio; and (5) violating the federal wire fraud statute in connection with the "no-show" jobs of Tom Bruno, Jackie Bruno, and Richard DeSciscio.

The government seeks the following remedial relief against defendant George Lachnicht. First, the government asks the Court to order that Lachnicht disgorge an amount equal to the salary he received from PSN between 1972 and 1989. Lachnicht and the government have stipulated to the amount of salary that he received during those years:

| Year | Amount Received |
|------|-----------------|
| 1972 | $ 6,000.00 |
| 1973 | 5,500.00 |
| 1974 | 6,000.00 |
| 1975 | 6,250.00 |
| 1976 | 7,500.00 |
| 1977 | 8,750.00 |
| 1978 | 10,000.00 |
| 1979 | 11,250.00 |
| 1980 | 12,500.00 |
| 1981 | 13,750.00 |
| 1982 | 15,000.00 |
| 1983 | 32,673.35 |
| 1984 | 32,409.95 |
| 1985 | 32,478.85 |
| 1986 | 33,296.08 |
| 1987 | 35,271.96 |
| 1988 | 36,298.97 |
| 1989 | 37,748.04 |

The amount totals $342,677.20, which the government seeks with prejudgment interest.

Second, the government seeks an order requiring Lachnicht to disgorge the $500 Christmas bonus payments that he received each year from 1983 through 1989 with prejudgment interest. Third, the government contends that Lachnicht should be held jointly and severally liable for the salaries obtained by the various "phantom" longshoremen whom he assisted in obtaining "no-show" jobs. This totals an additional $35,114.32. The government also seeks prejudgment interest.

In its brief the government claims that "the eleven defendants before the Court are largely responsible for the most recent wave of racketeering on the Waterfront." Government's Memorandum of Law in Support of its Request for Remedial Relief ("Govt.'s Remedy Mem.") at 2. While this grand statement may be true with respect to some of the defendants who defaulted—specifically John Gotti—it is not true with regard to George Lachnicht. Perhaps because so many of the defendants who actually are responsible for organized crime's influence over the Waterfront have defaulted, disproportionate attention has fallen upon Lachnicht. By the government's own admission, Lachnicht was a mere "pawn."

The government's request that the Court order Lachnicht to disgorge nearly half a million dollars demonstrates that the government has lost all perspective with regard to the actual role played by Lachnicht in the Waterfront criminal enterprise, as that enterprise was defined in this Court's Liability Opinion. *See* Liability Opinion, 812 F.Supp. at 1310–15. Lachnicht is presently retired from union office and is subsisting entirely on disability payments received from PSN. He is also heavily in debt—he owes approximately $200,000—because of his wife's gambling problem. He is of an age, and in a state of health, that he poses little threat to anyone.

After considering the role Lachnicht played in the RICO enterprise, and balancing the equities involved on all sides, this Court, in the exercise of its discretion under 18 U.S.C. § 1964, awards the government disgorgement in the amount of $15,000. The

Court found he embezzled. *See* Liability Opinion, 812 F.Supp. at 1331. In a separate Opinion issued today, this Court withdrew its finding that Carson embezzled his various expenses. *See* Rule 52(b) Opinion at 175. Accordingly, the government's request for an order disgorging Carson's expenses is denied.

government's request for prejudgment interest on the amount ordered disgorged today is denied. This is the full amount to which the government is entitled from Lachnicht.

### 4. The Government's Request for the Cost of Monitors

█ Finally, the government asks that the Court order that Mangano, Gallagher, and Carson, among others, are jointly and severally liable for the expense of the monitors and ombudsman appointed by the Court to oversee the affairs of the local unions and the expense of any administrator, special master, or other adjudicative bodies appointed by the Court to oversee the affairs of the Waterfront employers including the NYSA employers. In the exercise of this Court's equitable discretion, the government's request is denied, for the imposition of such an order would place on the defendants an undue hardship and would be inequitable given the nature of the predicate acts committed by defendants and the relation of those predicate acts to the Waterfront Enterprise.

### 5. Carson's Double Jeopardy Claim

█ Before we address the government's claim of entitlement to injunctive relief, we must briefly address one final argument advanced by Carson. Carson argues that the government's claim for monetary remedial relief is barred by the Double Jeopardy Clause of the United States Constitution.[14] Carson claims that the conduct underlying this Court's civil RICO liability finding was the same conduct that lead to his conviction in New Jersey that was subsequently vacated. Essentially Carson claims that disgorgement of his ill-gotten gains would constitute a second punishment.

14. The Double Jeopardy Clause provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V.

15. In assessing the government's costs in bringing this action, the Court notes that eight Assistant United States Attorneys participated in this litigation; over 100 depositions were taken; the government leased one full floor of the building located at 136 Church Street to serve as a New York Document Center for the case; the Document Center was staffed by systems analysts, trial

Carson relies principally on *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), for support. In *Halper*, the United States Supreme Court addressed whether and under what circumstances a civil penalty may constitute "punishment" for the purposes of double jeopardy analysis. The Court held that "the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve." *Id.* at 448, 109 S.Ct. at 1901. The Court continued:

> We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution.

*Id.* at 448–49, 109 S.Ct. at 1902. The Court left the district court much discretion in determining whether the size of the civil sanction the Government seeks "cross[es] the line between remedy and punishment." *Id.* at 450, 109 S.Ct. at 1902.

We do not believe that the remedial award granted today crosses that line. The relief obtained by the government is intended to restore the status quo by depriving the defendants of their ill-gotten gains and by using the proceeds to compensate, in various ways, the victims of the defendants' misdeeds and/or to rid the Waterfront of the pernicious influence of organized crime. As such, it cannot properly be characterized as "punishment." In addition, it is apparent that the government's costs of prosecuting this action exceeds the sum ordered disgorged from Carson.[15] *See United States v. Pani*, 717

support coordinators, senior paralegals, and clerical staff; the litigation support team managed a document library, which contained over 200 boxes of documents, designed four specialized applications for personal computers, and filmed over 1,000,000 pages. Govt.'s Mem. at 48. We do not believe that his is one of those "rare case[s]" in which an accounting of costs from the government is appropriate. *Halper*, 490 U.S. at 449, 109 S.Ct. at 1902.

Of course, these resources were expended prosecuting aspects of this case which, in the

F.Supp. 1013, 1019 (S.D.N.Y.1989) (civil penalty bore rational relationship to the goal of compensating the government for its loss, "considering the expenses of investigation and prosecution"). We believe that the relief granted by the Court will give the government the "rough remedial justice" to which it is entitled. *See Halper,* 490 U.S. at 448, 109 S.Ct. at 1901–02. Accordingly, Carson's double jeopardy argument is rejected.[16]

### B. Injunctive Relief

■ We turn next to the injunctive relief sought by the government. The government seeks an order permanently enjoining Carson, Gallagher, Lachnicht, and Mangano, and any person acting in concert with him, from committing any racketeering acts, and from having any dealings, directly or indirectly, with: (1) any person or entity on the Waterfront; (2) any labor organization; (3) any other defendant in this action; (4) any member or associate of organized crime.[17]

Section 1964(a) provides that the Court may issue an injunction "imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in." 18 U.S.C. § 1964(a). The Second Circuit has recently noted that district courts have the power under § 1964(a) to enjoin RICO violators from activities that might lead to future violations of the statute. *United States v. Private Sanitation Industry Ass'n,* 995 F.2d 375 (2d Cir. 1993) (upholding Judge Glasser's order enjoining defendant from participating directly or indirectly in carting industry and from associating with his co-defendants or with "known members and associates of organized crime for any commercial purpose"); *see also Bonanno,* 683 F.Supp. at 1446.

We think that the relief requested by the government is somewhat vague. Accordingly, in the exercise of this Court's equitable discretion, the following injunctive relief is granted against each of the four remaining defendants:

Defendants Donald Carson, Anthony Gallagher, George Lachnicht, and Venero Mangano are hereby permanently enjoined:

1. from committing any acts of racketeering activity, as defined in Section 1961 of Title 18 of the United States Code; and

2. from having any dealings, directly or indirectly, with any members or associate of organized crime for any commercial purpose concerning the affairs of the Waterfront, as that terms was defined by this Court, *see* Liability Opinion, 812 F.Supp. at 1310–14, or any labor organization; and

3. from having any dealings, directly or indirectly, with any other defendant in this action for any commercial purpose concerning the affairs of the Waterfront or any labor organization; and

4. from participating in any way in the affairs of or having any dealings, directly or indirectly, with (i) any labor organization, including, without limitation, the ILA and the ILA-related entities, including, but not limited to, any ILA district councils, ILA locals, or any ILA-affiliated employee benefit funds; (ii) any officer, agent, representative, employee, or member of ILA Locals 1804–1, 1588, 1814, 1809, 824, or 1909; (iii) any other officer, agent, representative, employee, or member of the ILA or any other labor organization concerning the affairs of such organization or the Waterfront; and (iv) any person or entity

Court's view, are of broader significance than the monetary relief relating to the final four individual defendants. For example, the government has obtained consent judgments against several union locals. Indeed, simultaneous with the issuance of this Opinion, the Court is entering a consent judgment against the New York Shipping Association. It is believed that these measures will go a long way towards eradicating the influence of organized crime on the Waterfront.

16. Mangano has never been prosecuted for any of the conduct underlying this civil RICO action; therefore, he cannot invoke the Double Jeopardy Clause.

17. Local 1588 joins the government in requesting that the Court permanently enjoin the defendants from either directly or indirectly having any contact with Local 1588 members or the Bayonne Waterfront. *See* Letter to the Court from Donna R. Newman, attorney for ILA Local 1588, dated June 22, 1993.

that does business on the Waterfront; and

5. from visiting the site of any ILA entity or other labor organization or communicating with any person who is at the site of any ILA entity or other labor organization.

We believe that this injunction is narrowly tailored to avoid any interference with the defendants' constitutional rights. We also believe that it will ensure that the defendants will commit no further racketeering acts on the Waterfront.

## III.

### GALLAGHER'S IN FORMA PAUPERIS APPLICATION

 Defendant Anthony Gallagher filed an application to proceed *in forma pauperis* with his appeal of the preliminary restraining order entered by this Court. The government opposed the application, principally on the ground that they were in possession of information that Gallagher has funded his newly opened "Dintino Check Cashing" company with $50,000, which would be subject to this Court's restraining order and which would indicate that Gallagher has assets sufficient to enable him to pay for the costs of any appeal he may wish to file. *See also* Declaration of F.B.I. Special Agent Joe Duenas, dated May 17, 1993. In a notarized affidavit, Gallagher denies that he funded his check cashing business with $50,000. Affidavit of Anthony Gallagher, dated June 1, 1993. We reserved decision, pending submission by the parties of all briefs relating to the remedy phase of this action.

After reviewing the Gallagher's application, and the government's arguments in opposition, we grant Gallagher's application to proceed *in forma pauperis* with his appeal of the temporary restraining order.

### CONCLUSION

After considering all of the arguments advanced by the defendants, many of which are moot in light of the nature of the award granted by the Court, this Court grants relief to the government as set forth in detail in the text of this Opinion. Any objection urged by a party on which the Court has not commented has been considered by the Court and rejected summarily as irrelevant or meritless.

This Opinion marks the end of this civil RICO action with regard to defendants Donald Carson, Anthony Gallagher, George Lachnicht, and Venero Mangano. The government is to submit to the Court, within seven business days, a proposed judgment setting forth the relief granted to it by the Court.

SO ORDERED.