52 F.3d 1173
 149 L.R.R.M. (BNA) 2001, 130 Lab.Cas. P 11,313
 UNITED STATES of America, Plaintiff-Appellee,
v.
Donald CARSON, Defendant-Appellant,
LOCAL 1804-1, ILA; John Barbato; George Barone; John
Bowers; George Bradley; Thomas Buzzanca; Sato Calabrese;
Ronald Capri; Harry Cashin; James J. Cashin; Anthony
Ciccone; Joseph Colozza; Vincent Colucci; James Coonan;
Michael Coppola; Harold Daggett; Doreen Supply Company,
Inc.; Tino Fiumara; Anthony Gallagher; Robert Gleason;
John Gotti; Leroy Gwynn; ILA Local 1588; ILA Local 1588,
Executive Board; ILA Local 1809; ILA Local 1809, Executive
Board; ILA Local 1814; ILA Local 1814, Executive Board;
Anthony Anastasio; ILA Local 1909; Blase Terraciano; ILA
Local 1909, Executive Board; ILA Local 824; ILA Local 824,
Executive Board; Kevin Kelly; Joseph C.F. Kenny; George
Lachnicht; Gregory Lagana; Frank Lonardo; Venero Mangano;
James McElroy; Metropolitan Marine Maintenance
Contractors; Carlos Mora; New York Shipping Association;
Nodar Ship Repair, Inc.; Ralph Perello; Louis Pernice;
Richard Pierce; Anthony Pimpinella; John Potter; Douglas
Rago; Joseph Randazzo; Thomas Ryan; Anthony Salerno;
Frank Scollo; Anthony Scotto; Alfred Small; and Dominick
Sanzo, Defendants.
Donald J. CARSON and Peggy Carson, Plaintiffs-Appellants,
v.
LOCAL UNION 1588, I.L.A., ITS OFFICER, EXECUTIVE BOARD AND
TRUSTEES, Defendant-Appellee.
 No. 514, Docket 94-6044.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 21, 1994.
Decided April 12, 1995.
 
 Fredric J. Gross, Mount Ephraim, NJ, for defendant-appellant Donald J. Carson, plaintiffs-appellants Donald J. Carson and Peggy Carson.
 Claude M. Millman, Asst. U.S. Atty. for S.D.N.Y., New York City (Mary Jo White, U.S. Atty., Steven I. Froot, Asst. U.S. Atty., on the brief), for plaintiff-appellee U.S.
 Donna R. Newman, Jersey City, NJ, for defendant-appellee Local Union 1588.
 Before: OAKES, JACOBS and CALABRESI, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 The government asserted civil claims under the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. Sec. 1961 et seq. ("RICO"), alleging that appellant Donald J. Carson committed various racketeering acts on behalf of organized crime while Carson was Secretary-Treasurer of Local 1588 of the International Longshoremen's Association ("ILA").[1] Following a bench trial in which the district court heard ten weeks of evidence and argument distributed over an eleven month period, the United District Court for the Southern District of New York (Sand, J.) entered a final judgment in favor of the government, (1) granting injunctive relief, (2) ordering Carson to disgorge ill-gotten gains, and (3) imposing approximately $46,000 of costs. Carson appeals on numerous grounds. In addition, appeal is taken from the district court's dismissal of a complaint filed by Carson and his wife, Peggy Carson, against Local 1588 under the Employee Retirement Income Security Act of 1974, 29 U.S.C. Secs. 1001 et seq. ("ERISA"). This ERISA action had been consolidated with the civil RICO suit.
 
 
 2
 On his appeal from the civil RICO judgment, Carson contends: (1) that the district court exceeded the scope of its jurisdiction under 28 U.S.C. Sec. 1964 when it ordered him to disgorge his past ill-gotten gains; (2) that the disgorgement order violated the Double Jeopardy Clause of the Constitution; (3) that the injunctive relief was overbroad; (4) that a portion of a transcript from a prior criminal proceeding was improperly admitted into evidence in the civil proceeding; (5) that Carson was prejudiced by the scheduling of the ten weeks of trial over an eleven month period and other features in the conduct of the trial; and (6) that excessive costs were taxed by the clerk of the court. Finally, the Carsons argue that the district court erred when it dismissed their ERISA claim against Local 1588.
 
 
 3
 We affirm in part, vacate in part and remand to the district court for re-consideration consistent with this opinion.
 
 BACKGROUND
 
 4
 This civil RICO action followed in the wake of a criminal prosecution. The civil action was commenced after Carson's criminal conviction in 1988; judgment was entered in the civil action after the Third Circuit's decision in July 1992 overturning the criminal conviction.
 
 
 5
 In August 1988, Carson was convicted in the District of New Jersey for participating in a conspiracy to conduct the affairs of an enterprise through a pattern of racketeering. The criminal indictment essentially charged that Carson, who served from 1972 until 1988 as the Secretary-Treasurer of ILA Locals 1587 and 1588,[2] accepted kickbacks from a waterfront employer at the Military Ocean Terminal, in Bayonne, New Jersey ("MOTBY"), in exchange for labor peace. MOTBY is a government-owned facility used primarily to handle military cargo. The kickbacks were shared by Carson and various associates of the Genovese organized crime family.
 
 
 6
 The government's original civil RICO complaint, filed on February 14, 1990, named more than 50 individual defendants. By the time the trial concluded in 1993, four remained, including Carson. Relying on live testimony, recorded on more than 5,000 transcript pages, and on exhibits and deposition transcripts, the district court found that, during Carson's tenure as the secretary-treasurer of Local 1588, he acted on behalf of organized crime and a group described as the Waterfront Enterprise. The district court found that this Waterfront Enterprise was an alliance among union officials, waterfront businessmen and members of the Genovese and Gambino organized crime families. The district court found that Carson contributed to the wrongdoing of the Enterprise by (1) engaging in a kickback scheme which resulted in the loss of wages for the members of his union, (2) improperly accepting offers of meals and entertainment from union employers, (3) embezzling salary payments from the union, and (4) extorting the democratic rights of Local 1588's membership by maintaining a climate of fear in the union. These findings appear in the second of the five district court opinions that are referenced herein. These opinions, numbered for future reference, are listed in the margin.[3]
 
 
 7
 The MOTBY Scheme: Some time prior to 1981, the federal government leased for commercial use 33 acres of MOTBY to Consolidated Pier Developers ("CPD"), a company controlled by co-defendant Gallagher. CPD, in turn, subleased a building on these 33 acres to United Terminal, Inc. ("UTI"). Sealand Service, Inc. ("Sealand"), a shipping company that moved containerized cargo worldwide, relocated its operations to MOTBY in 1981. UTI served as Sealand's contractual stevedore.
 
 
 8
 According to the record, two different classes of waterfront laborers are commonly used to load and unload ships: deep-sea labor, and warehousemen labor. Deep-sea laborers in Bayonne were members of Local 1587 while warehouseman laborers were members of Local 1588; both locals were run by Carson. At the time the illegal MOTBY activities took place, deep-sea laborers were paid roughly $5 more per hour than warehouse laborers. ILA policy required that deep-sea labor be used for loading and unloading oceangoing vessels, and opposed the use of "mixed labor" forces.
 
 
 9
 The contract between Sealand and UTI incorporated the higher wages of the deep-sea laborers. Evidence at trial indicated, however, that after Sealand relocated to MOTBY, UTI no longer hired only deep-sea laborers for the loading and unloading of oceangoing vessels. Instead, pursuant to an agreement among Carson and others, the ships were loaded and unloaded by a mixed labor force. In total, during the 15 months during which this arrangement existed (from June 1981 through September 1982), UTI saved at least $546,000 in wages by using the lower paid warehouse laborers for work generally done using deep-sea laborers. The district court found that Carson, who signed the union contract with UTI, received a payoff for arranging this utilization of labor.
 
 
 10
 Based on these findings, the district court concluded that Carson had violated the Taft-Hartley Act, 29 U.S.C. Sec. 186(b), which makes it unlawful for any labor representative to "request, demand, receive, or accept ... any money or thing of value" from an employer. 29 U.S.C. Sec. 186(b)(1).
 
 
 11
 Meals and Entertainment: The government presented the district court with evidence from the Waterfront Commission audit report documenting occasions on which employers of ILA labor paid for Carson's meals and entertainment. The district court found that the acceptance of such meals and entertainment also violated the Taft-Hartley Act.
 
 
 12
 Embezzlement of Funds: In 1982, Carson was elected General Organizer of the ILA International. Although his new position required that he spend up to 80 percent of his working time at this new position, Carson did not relinquish his position as the secretary-treasurer of Local 1588. His salary from the Local decreased slightly, but still exceeded $50,000. At about the same time, Carson made William Fullam a full-time officer of Local 1588, raising Fullam's salary to match his own. Thus, Carson's elevation to a position in the ILA International thereby caused a substantial increase in Local 1588's total outlay for union officers--from $99,421 in 1981 to $131,628 in 1983. This increase in salary expense, exceeding 30 percent over three years, was made without the required approval of the membership of Local 1588.[4] The district court concluded that Carson's continued draw of virtually full salary while working for Local 1588 part-time constituted embezzlement of union funds under 29 U.S.C. Sec. 501(c). See Carson II, 812 F.Supp. at 1330.
 
 
 13
 Creating a Climate of Fear: Finally, the district court found that Carson displayed his organized crime associations to union members, and that the members were influenced to accept his leadership of the union by their knowledge of these ties. In this way, the district court found that Carson used intimidation and fostered an environment of fear in order to suppress the democratic rights of union members, in violation of 29 U.S.C. Sec. 501(a).
 
 
 14
 In July 1990, this civil RICO suit was consolidated for purposes of trial with the claim brought by Carson and his wife against Local 1588 claiming entitlement to a pension.
 
 
 15
 When the non-jury trial commenced before Judge Sand in April 1991, the Carsons were represented by retained counsel on their ERISA claim against the union while Carson represented himself pro se in the civil RICO action. Fredric Gross, the Carsons' ERISA attorney, chose not to attend most of the civil proceedings before the district court. The bulk of the trial was, therefore, conducted without the benefit of a representative of Carson in attendance.
 
 
 16
 Near the end of the trial, Gross apparently realized that resolution of the RICO claim might impact upon resolution of the ERISA claim and expressed an interest in defending Carson against the RICO claims as well. In response to a request by Gross, the district court ordered the government to "use its best efforts" to present evidence relevant to Carson's interests in both the civil RICO case and the ERISA case in a "compact" manner. Joint Appendix ("JA") at 1380.
 
 
 17
 Gross filed a notice of a general appearance on October 18, 1991 and actually answered the government's civil complaint as it pertained to Carson on January 29, 1992, nearly two years after the complaint had been served on Carson and several weeks after the government had rested its case against him. Ultimately, the government presented little live testimony against Carson after Gross filed his notice of general appearance. Part of the evidence that was introduced, however, was a portion of co-defendant Anthony Gallagher's testimony at his earlier criminal trial (called the "Gallagher confession" by the district court). The transcript of Gallagher's testimony was received into evidence in the civil trial without objection from any defendant on January 2, 1992. Also admitted into evidence was the transcript of several wiretaps used in the prosecution of the criminal case against Carson. The Gallagher confession and the transcripts of the wiretaps presented the district court with strong evidence of Carson's involvement in the MOTBY kickback scheme.
 
 
 18
 Carson presented his limited defense during the evenings of January 29 and 30, 1992. He called five witnesses. The district court ruled that Carson was collaterally estopped from disputing factual issues resolved against him in the earlier New Jersey district court criminal trial, and denied Carson the latitude to contest these issues at the later civil trial. JA at 858, 989.
 
 
 19
 On July 9, 1992, the Third Circuit vacated Carson's New Jersey conviction, and ordered the suppression of most of the wiretap transcripts used to convict Carson in his criminal trial. See United States v. Carson, 969 F.2d 1480 (3d Cir.1992). On December 31, 1992 the government declined the opportunity to re-try Carson on the criminal charges, and agreed to dismiss the indictment.
 
 
 20
 Several weeks after the Third Circuit decision ordering the suppression of the wiretap transcripts in the criminal case, the government voluntarily withdrew the transcripts from the record of the civil RICO case. The government also filed a memorandum explaining what evidence it intended to rely on in lieu of the wiretap transcripts. Included in this list of proposed substitute evidence was the Gallagher confession.
 
 
 21
 On July 30, 1992, the district court ordered the parties to submit briefs appraising the impact of the Third Circuit decision on the civil RICO action. Carson's brief asked the district court to declare a mistrial on the grounds that he had been (a) wrongly barred from contesting the facts behind his conviction and (b) coerced into invoking the Fifth Amendment at his deposition in the civil case. In the alternative, Carson also requested the suppression of all evidence "derivative" of the improperly admitted wiretap tapes. He did not particularize what this derivative evidence was, though he argues on appeal that this motion was a direct challenge to the Gallagher confession. The government's reply brief emphasized the importance of the Gallagher confession as "uncontroverted direct evidence" of Carson's wrongful acts.
 
 
 22
 The district court issued its findings of fact and conclusions of law on January 14, 1993. Carson II, 812 F.Supp. 1303. The court did not base its factual findings on the transcripts of the wiretaps suppressed by the Third Circuit. It did, however, rely substantially on the Gallagher confession, which Carson contends is derivative of the suppressed wiretaps.
 
 
 23
 As to the Carsons' ERISA suit against Local 1588, the district court found that Carson was estopped from claiming his pension benefits by his breach of fiduciary duty owed to the union, and dismissed the ERISA complaint.
 
 
 24
 Carson moved pursuant to Federal Rule of Civil Procedure 52(b) to amend the district court's findings. As part of his motion, Carson requested that the district court reconsider the admission of the Gallagher confession. On August 19, 1993, the district court issued an opinion modifying its earlier findings. Carson IV, 831 F.Supp. 167. In denying Carson's request to suppress the Gallagher confession, the court noted that Carson had failed to object when it was introduced at trial as well as in his initial post-trial briefing, and that Carson had failed to identify a "good reason" for his failure to make "a timely and specific objection to the Gallagher confession." Id. at 172. The court added: "Since the Court gave the defendants an opportunity to raise this objection, and since the defendants failed to avail themselves of this opportunity, this Court will not consider their new theory for suppression of the Gallagher confession at this late date in the proceedings." Id.
 
 
 25
 On August 19, 1993, the district court also issued its opinion spelling out remedies. Carson V, 831 F.Supp. 177. The court (1) issued an injunctive order preventing Carson from dealing with any person involved in either organized crime or a labor organization, (2) ordered Carson to disgorge $16,100 in connection with his role in the MOTBY scheme and (3) ordered Carson to disgorge $60,000 in connection with his embezzlement of salary payments. On January 26, 1994, the district court approved the government's request for $45,905.36 in costs as assessed by the Clerk over Carson's objection.
 
 DISCUSSION
 
 26
 A. Jurisdiction.
 
 
 27
 Before turning to Carson's specific claims on appeal, we first consider a challenge to appellate jurisdiction interposed by defendant-appellee ILA Local 1588. The district court exercised jurisdiction over the civil RICO suit pursuant to 18 U.S.C. Sec. 1964. District court jurisdiction over the ERISA claim was pursuant to 29 U.S.C. Sec. 1132.
 
 
 28
 The order of final judgment was entered on November 12, 1993. Ordinarily, under Fed.R.App.P. 4(a)(1), a notice of appeal must be filed with the Clerk of the district court within 30 days after the date of entry of the order of final judgment. In this case, however, because the United States was a party, Rule 4(a)(1) allows 60 days for filing the notice of appeal. Accordingly, Carson's notice of appeal was due on January 11, 1994.
 
 
 29
 The Clerk's Office did not receive the Carsons' Notice of Appeal until January 12, 1994,[5] one day after the time to appeal elapsed. The Carsons moved for an extension of time to file their already late Notice of Appeal, pursuant to Fed.R. of App.P. 4(a)(5), which allows the district court to extend the time for filing "upon a showing of excusable neglect or good cause." The Carsons' attorney told the district court that the Carsons' Notice of Appeal had been sent on Friday, January 7, 1994 from the United States Post Office in Mount Ephraim, New Jersey, with the hope that it would arrive on or before Tuesday, January 11, 1994.
 
 
 30
 When deciding a Rule 4(a)(5) motion the district court must consider " 'the danger of prejudice to the [non-movant], the length of the delay and its potential impact upon judicial proceedings, the reason for the delay, including whether it was in the reasonable control of the movant, and whether the movant acted in good faith.' " United States v. Hooper, 9 F.3d 257, 259 (2d Cir.1993) ("Hooper I ") (quoting Pioneer Investment Serv. Co. v. Brunswick Assoc. Ltd. Partnership, --- U.S. ----, ----, 113 S.Ct. 1489, 1498, 123 L.Ed.2d 74 (1993)).
 
 
 31
 In an opinion issued prior to Pioneer Investment, we had specifically held that "uncontrollable delays in mail delivery" may be a basis for a finding of excusable neglect. In re Cosmopolitan Aviation Corp., 763 F.2d 507, 514 (2d Cir.) (emphasis added), cert. denied, 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985). We question whether the performance of the Postal Service in delivering this document in two business days constitutes such an "uncontrollable delay[ ]".[6] Nevertheless, the Rule 4(a)(5) inquiry " 'is at bottom an equitable one,' " Hooper I, 9 F.3d at 259 (quoting Pioneer Investment, --- U.S. at ----, 113 S.Ct. at 1498), subject to appellate review solely for abuse of discretion. See United States v. Hooper, 43 F.3d 26, 29 (2d Cir.1994) ("Hooper II "). After considering each of the factors identified by the Supreme Court in Pioneer Investment, the district court elected to grant the Rule 4(a)(5) relief sought.[7] We cannot conclude that this grant of equitable relief was an abuse of the district court's discretion.
 
 
 32
 Appellate jurisdiction therefore exists pursuant to 28 U.S.C. Sec. 1291.
 
 
 33
 B. Disgorgement Under Civil RICO.
 
 
 34
 Carson argues that the remedies available under 18 U.S.C. Sec. 1964 do not include the type of disgorgement ordered in his case and that therefore the district court lacked the jurisdictional power to issue such an order. The district court ordered that Carson disgorge the $16,100 in kickbacks he received during 1981 and 1982 as consideration for his role in the MOTBY scheme. The court further ordered that Carson disgorge the estimated $60,000 that the court found he had embezzled from 1982 through 1988 when he collected a full-time salary while dedicating only a portion of his time to Local 1588.[8] These sums were significantly less than the amount of disgorgement sought by the government.
 
 
 35
 As a general rule, disgorgement is among the equitable powers available to the district court by virtue of 28 U.S.C. Sec. 1964. See United States v. Private Sanitation Indus. Ass'n, 995 F.2d 375 (2d Cir.1993), aff'g 811 F.Supp. 808, 818 (E.D.N.Y.1992); United States v. Private Sanitation Indus. Ass'n, 44 F.3d 1082 (2d Cir.1995). Carson argues, however, that disgorgement was an inappropriate remedy in his case because "[e]quitable RICO remedies ... are available only to prevent ongoing and future misconduct, and not to remedy past misconduct." Brief of Appellant at 25-26 (emphasis in original). The question of whether Sec. 1964 authorizes disgorgement of gains ill-gotten long in the past is a question of first impression in this Circuit.
 
 
 36
 In rejecting Carson's argument and deciding to order disgorgement, the district court relied on the argument presented in United States v. Bonanno Organized Crime Family of La Cosa Nostra, 683 F.Supp. 1411, 1442-49 (E.D.N.Y.1988), aff'd on other grounds, 879 F.2d 20 (2d Cir.1989). In Bonanno, Judge Glasser reviewed the legislative history of RICO, and concluded that Sec. 1964(a) was intended to grant the courts broad equitable power:
 
 
 37
 The authority to order disgorgement derives from the broad equitable powers given courts under the securities laws to provide such remedies as are necessary to make effective the congressional purpose.... The fashioning of equitable remedies under the securities laws lies within the sound discretion of the court.... A court exercising the broad equitable powers of RICO's Sec. 1964 has similar, if not wider, latitude in designing appropriate relief.
 
 
 38
 Id. at 1448 (citations and internal quotations omitted). Included within this "broad equitable power[ ]" is the power to order defendants to disgorge "any proceeds from the unlawful conduct of or participation in the enterprise's affairs." Id. at 1449; see also United States v. Private Sanitation Indus. Ass'n, 793 F.Supp. 1114, 1152 (E.D.N.Y.1992); United States v. Int'l Bhd. of Teamsters, 708 F.Supp. 1388, 1408 (S.D.N.Y.1989).
 
 
 39
 A plain reading of the statute does not support the broad interpretation adopted by the district court and urged by the government. Section 1964 states in pertinent part:
 
 
 40
 (a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restriction on the future activities or investments of any person including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provisions for the rights of innocent persons.
 
 
 41
 (b) The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining order or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.
 
 
 42
 (Emphasis added.) This section confers on the district court powers "to prevent and restrain violations of section 1962." There are no additional sources of jurisdiction. The three examples contained in the text of section 1964(a) are forward looking, and calculated to prevent RICO violations in the future. As the government urges, RICO has a broad purpose: the legislative history of Sec. 1964 indicates that the equitable relief available under RICO is intended to be "broad enough to do all that is necessary." S.Rep. No. 617, 91st Cong., 1st Sess. at 79 (1969). Nevertheless, we do not see how it serves any civil RICO purpose to order disgorgement of gains ill-gotten long ago by a retiree.
 
 
 43
 The district court was "troubled by the consequences" of failing to employ the disgorgement remedy simply because Carson is no longer a member of the union from which he conducted his racketeering activities:
 
 
 44
 [i]f Carson is correct that his separation from the union in and of itself removes this Court's power to grant equitable relief like disgorgement--because he will no longer be in a position to engage in labor racketeering--that would mean that a union racketeer, after raiding the union coffers, need only quit his position in order to retain the ill-gotten gains of his tenure. We believe that Congress intended ... to prevent such a result.
 
 
 45
 Carson III, 1993 WL 77319, at * 4. However, the jurisdictional powers in Sec. 1964(a) serve the goal of foreclosing future violations, and do not afford broader redress. The section does not authorize the government to recapture all the losses of those wronged by civil RICO violators. If the parties from whom Carson wrongfully took money wished to recover it, they could have pressed their own claims. The issue presented is therefore whether the disgorgements ordered here are designed to "prevent and restrain" future conduct rather than to punish past conduct.
 
 
 46
 The vast majority of the money the district court has ordered Carson to disgorge was received by him long before the civil suit was ever brought against him in 1990. All of the $16,100 ordered disgorged in connection with the MOTBY scheme was received in 1981 and 1982. The $60,000 ordered disgorged in connection with the salary embezzlement was received between 1982 and 1988. Much of this money was acquired by Carson too far in the past for its disgorgement to be part of an effort to "prevent and restrain" future conduct.
 
 
 47
 Categorical disgorgement of all ill-gotten gains may not be justified simply on the ground that whatever hurts a civil RICO violator necessarily serves to "prevent and restrain" future RICO violations. If this were adequate justification, the phrase "prevent and restrain" would read "prevent, restrain and discourage," and would allow any remedy that inflicts pain. Ordinarily, the disgorgement of gains ill-gotten long in the past will not serve the goal of "prevent[ing] and restrain[ing]" future violations unless there is a finding that the gains are being used to fund or promote the illegal conduct, or constitute capital available for that purpose. The disgorgement of gains ill-gotten relatively recently is more easily justifiable on the basis of the same analysis.
 
 
 48
 We do not determine what portion (if any) of the disgorgement order should ultimately survive. Rather, we vacate the existing order of disgorgement and remand to the district court for a determination as to which disgorgement amounts, if any, were intended solely to "prevent and restrain" future RICO violations.
 
 
 49
 C. Double Jeopardy.
 
 
 50
 Carson argues that, even if the order of disgorgement was authorized by Sec. 1964, it was barred by the Double Jeopardy Clause of the United States Constitution. He argues that the conduct underlying the civil order was identical to the conduct that resulted in his conviction on criminal charges in New Jersey. The district court properly rejected Carson's double jeopardy argument on the ground that the monetary award the Court ordered Carson to pay was not punitive in character.[9] The leading case on the application of the Double Jeopardy Clause to civil suits is United States v. Halper, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989). Halper acknowledged that, in certain circumstances, a civil penalty might implicate the Double Jeopardy Clause: "[I]n determining whether a particular civil sanction constitutes criminal punishment, it is the purposes actually served by the sanction in question, not the underlying nature of the proceeding giving rise to the sanction, that must be evaluated." Id. at 447 n. 7, 109 S.Ct. at 1901 n. 7; see also Department of Revenue of Montana v. Kurth Ranch, --- U.S. ----, ----, 114 S.Ct. 1937, 1945, 128 L.Ed.2d 767 (1994) ("the legislature's description of a statute as civil does not foreclose the possibility that it has a punitive character").
 
 
 51
 Nevertheless, the Court essentially left it to the discretion of district court judges to ascertain whether the civil sanction "cross[es] the line between remedy and punishment." Halper, 490 U.S. at 450, 109 S.Ct. at 1902; see also United States v. Certain Real Property and Premises Known as 38 Whalers Cove Drive, 954 F.2d 29, 33-35 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992). "[U]nder the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." Halper, 490 U.S. at 448-49, 109 S.Ct. at 1902.
 
 
 52
 The central question to be answered by a district court is whether or not the monetary award is punitive. Halper teaches that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment." Id. at 448, 109 S.Ct. at 1902. The awards made in this case--both the disgorgement and the obligation to reimburse the government for its costs--were compensatory in nature. Disgorgement, by design, is compensatory. See SEC v. Shapiro, 494 F.2d 1301, 1309 (2d Cir.1974); SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1308 (2d Cir.), cert. denied, 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971). Indeed, the Supreme Court has specifically identified an order of disgorgement as compensatory, as opposed to punitive, in nature. See Tull v. United States, 481 U.S. 412, 422-23, 107 S.Ct. 1831, 1838, 95 L.Ed.2d 365 (1987). So long as an order of disgorgement remains within the bounds authorized by Sec. 1964 as we have outlined above, the order is not punitive. Similarly, the court costs assessed against Carson by the Court Clerk were designed to compensate the government for the cost of the civil RICO trial and not to punish Carson for his wrongdoing.
 
 
 53
 Ultimately, the civil monetary judgment must be "rationally related to the goal of making the Government whole." Halper, 490 U.S. at 451, 109 S.Ct. at 1903. Here, the government's cost of prosecuting Carson (even when one considers that Carson was just one of many defendants) far exceeded the judgment rendered against Carson. Indeed, in assessing the costs of the civil RICO action, the district court noted that eight Assistant United States Attorneys participated in the litigation, more than 100 depositions were taken and, one full floor of a building was leased by the government as a document center to store records associated with the trial. See Carson V, 831 F.Supp. at 190 n. 15. We agree with the district court that this is not one of "the rare case[s]" in which the civil penalty sought "bears no rational relation to the goal of compensating the Government for its loss," and therefore "entitle[§ the defendant] to an accounting of the Government's damages and costs to determine if the penalty sought in fact constitutes a second punishment." Halper, 490 U.S. at 449-50, 109 S.Ct. at 1902; see also United States v. Pani, 717 F.Supp. 1013, 1019 (S.D.N.Y.1989) (considering the expense of investigation and prosecution, civil penalty bore rational relationship to the goal of making the government whole). The civil proceedings did not violate Carson's double jeopardy rights.
 
 
 54
 D. The Breadth of the Injunction.
 
 
 55
 Carson argues that no injunction was warranted in this case, and that, in any event, the injunction imposed upon him was overly broad. The RICO statute expressly authorizes the imposition of "reasonable restrictions on the future activities" of violators. 18 U.S.C. Sec. 1964(a). This Court has given a broad reading to the phrase "reasonable restrictions". See United States v. Private Sanitation Indus. Ass'n, 995 F.2d 375, 377 (2d Cir.1993) (the statute "grants courts broad discretion and latitude in enjoining violators from activities that might lead to future violations"). In general "a district court has broad discretion to enjoin possible future violations of law where past violations have been shown, and the court's determination that the public interest requires the imposition of a permanent restraint should not be disturbed on appeal unless there has been a clear abuse of discretion." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir.1972).
 
 
 56
 We are obliged to consider whether, in view of all the circumstances, it was an abuse of discretion for the district court to find "a reasonable likelihood that the wrong will be repeated." Id. Courts are free to assume that past misconduct is "highly suggestive of the likelihood of future violations." SEC v. Management Dynamics, Inc., 515 F.2d 801, 807 (2d Cir.1975). "When the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct." Commodity Futures Trading Comm'n v. Hunt, 591 F.2d 1211, 1220 (7th Cir.1979).
 
 
 57
 Here, the district court has made sufficient findings to support the conclusion that there was a "reasonable likelihood" that, absent an injunction, Carson would attempt to return to a position in which he could engage in racketeering. Carson had already helped deprive the union's members of $546,000 in wages. He had illegally accepted free meals from employers. Finally, he had used his ties to the Genovese Crime Family to "maintain[ ] a climate of fear in the union and [to] exploit[ ] that fear to maintain control of [the union.]" Carson II, 812 F.Supp. at 1338.
 
 
 58
 Carson also argues that, even if some restriction on his conduct was warranted, the order handed down was overly broad. "[T]he contours of an injunction are shaped by the sound discretion of the trial judge and, barring an abuse of that discretion, ... will not be altered on appeal." George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1542 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992). The terms of the injunction are set forth in the margin.[10] After enjoining Carson from future racketeering, as that term is used in the RICO statute, the injunction terminates Carson's future participation in the affairs of any labor organization. This quarantine is absolute and permanent. The injunction bars Carson even from joining a union (although the language added by the order dated November 5, 1993 allows an employer to pay union dues on his behalf and thereby assures that Carson is not foreclosed from employment in a closed shop). Carson argues that the objectives of the statute would have been fully satisfied, assuming any injunction was needed in the first place, if Carson had been barred from assuming positions of union leadership. This argument rests on the dubious assumption that Carson's future role in any union organization would be defined by the union constitution and bylaws. The district court found that Carson's leadership was reinforced by a climate of fear, in which union members were encouraged to see and appreciate his connections to organized crime. Since Carson drew his power and influence from such sources, the district court is not obliged to assume that his power within a union would be limited by its constitution and bylaws, or that his influence would spring from his innate qualities of leadership. Nor did the district court abuse its discretion in shaping an injunction that takes account of these findings and probabilities.
 
 
 59
 Carson's argument that the injunction interferes with his First Amendment freedom of association is meritless. "[A]n individual's right to freedom of association may be curtailed to further" the public's "compelling interest in eliminating the public evils of crime, corruption, and racketeering in union activity." United States v. Int'l Bhd. of Teamsters, 941 F.2d 1292, 1297 (2d Cir.1991) (citations and internal quotations omitted).
 
 
 60
 E. The Gallagher confession.
 
 
 61
 Carson contends that the Gallagher confession--which is a critical underpinning of the district court's finding of liability concerning the MOTBY scheme--was derivative of the excluded wiretap tapes and likewise should have been excluded from evidence as fruit of the poisonous tree.
 
 
 62
 We fully appreciate the weight and importance of the Gallagher confession: without that evidence, it is difficult to imagine that the district court could have found that Carson was involved in the MOTBY scheme. The district court treated this issue as pivotal in the post-trial motions: "Of all the arguments advanced by the parties in these motions--and there are many--the most important concerns the admissibility of defendant Gallagher's criminal trial testimony which this Court has referred to as the 'Gallagher confession.' " Carson IV, 831 F.Supp. at 169.
 
 
 63
 Carson was convicted on the criminal charges in the District of New Jersey on August 19, 1988. The Third Circuit affirmed this conviction in an unpublished opinion on February 28, 1989. United States v. Carson, 870 F.2d 652 (3d Cir.1989). Carson did not seek further review of this conviction. However, Carson's co-defendant Anthony Gallagher did petition the United States Supreme Court for certiorari. While this petition was pending, the Supreme Court issued United States v. Ojeda Rios, 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990). In essence, Ojeda Rios held that, where surveillance tapes are not immediately sealed by the prosecution in accordance with 18 U.S.C. Sec. 2518(8)(a), the tapes (and the transcripts of the tapes) must be suppressed unless the delay is adequately explained, even if the prosecutor offers evidence to establish that the tapes were not subject to tampering. On May 14, 1990, the Supreme Court granted Gallagher's petition for certiorari, vacated his conviction and remanded the case to the Third Circuit for reconsideration in light of Ojeda Rios. Gallagher v. United States, 495 U.S. 926, 110 S.Ct. 2162, 109 L.Ed.2d 492 (1990).
 
 
 64
 Carson then petitioned the Third Circuit to recall its mandate in his case. On July 27, 1990, the Third Circuit did recall its mandate and returned the case to the district court for reconsideration in light of Ojeda Rios. United States v. Carson, 909 F.2d 1477 (3d Cir.1990). On November 21, 1990, the district court denied Carson's motion to suppress the tapes. United States v. Gallagher, 751 F.Supp. 481 (D.N.J.1990). Carson appealed to the Third Circuit, which, on July 9, 1992 issued a decision ordering the suppression of some of the surveillance tapes used to convict him. United States v. Carson, 969 F.2d 1480 (3d Cir.1992).
 
 
 65
 At the criminal trial in New Jersey, the prosecutors used the transcript of wiretapped conversation (the tapes of which were later suppressed by the Third Circuit) to elicit testimony about conversations in which Gallagher participated. One portion of that testimony constitutes the Gallagher confession at issue in the present appeal:
 
 
 66
 Q. The top of the page, eight lines from the top, you said:
 
 
 67
 "So Benny made a division. $10 to Newark. $5 to Mike Losito. $5 to him and Macey and I should give $5 to Donald Carson, and tell Donald don't give anything to Macey. I'll take care of him."
 
 
 68
 Q. The Benny that you talked about there was Benny Mangano. Isn't that true Mr. Gallagher.
 
 
 69
 A. Yes, sir.
 
 
 70
 Q. And the $5 to him and Macey, Macey is Mr. John DiGillo?
 
 
 71
 A. That's correct.
 
 
 72
 Q. And the Donald Carson that you were talking about is the defendant in this case; isn't that true?
 
 
 73
 A. That's correct. That's correct.
 
 
 74
 Q. And the division that you were talking about was $25 a container; isn't that true, Mr. Gallagher?
 
 
 75
 A. Yeah. Whatever the numbers show.
 
 
 76
 JA at 525.
 
 
 77
 The use of wiretap evidence is governed by 18 U.S.C. Sec. 2517, which states in pertinent part:
 
 
 78
 (2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.
 
 
 79
 (3) Any person who has received, by any means authorized by this chapter, any information concerning a wire, oral, or electronic communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.
 
 
 80
 The wiretap tapes were suppressed by the Third Circuit because the government failed to seal them promptly. This requirement for prompt sealing is contained in section 2518(8)(a):
 
 
 81
 The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.
 
 
 82
 (Emphasis added.) By its terms, the sealing requirement only applies to subsection (3) of section 2517 and not to subsection (2) or (1). Cf. United States v. Donlan, 825 F.2d 653, 655 (2d Cir.1987). We therefore consider whether any derivative use made of the suppressed tapes is the type of use addressed in subsection (3) or in subsection (2) of section 2517, and whether that makes a difference.
 
 
 83
 Subsection (3) of section 2517 allows the disclosure in testimony at trial of wiretaps "or such derivative evidence" by a person who has received wiretaps authorized by the statute, while subsection (2) more generally allows use of the "contents" of wiretaps authorized by the statute in a manner appropriate to "the proper performance" of official duties. The government argues that use of the Gallagher confession was controlled by Sec. 2517(2)--and therefore was not precluded by the failure to seal the tapes properly. According to the government, subsection (3) deals solely with testimony by one who "received" the wiretap and testifies on the basis of having received it. The government asks us to characterize the trial episode in terms of subsection (2), whereby a prosecutor as "law enforcement officer" (see 18 U.S.C. Sec. 2510(7)), who has "obtained knowledge of the contents" of the wiretap, "use[s] such contents" to frame effective and productive questions to a witness with first-hand knowledge of the conversation, in a way that is "appropriate to the proper performance" of the prosecutor's duties.
 
 
 84
 Carson contends that the transcript of the crucial Gallagher testimony was not (as the government asserts) based solely "upon his participation in the conversation." This is a close question. The testimony consists largely of the prosecutor's reading and decipherment of the wiretap, punctuated by Gallagher's passive assents. There is no clear sign that Gallagher's memory of the conversation was independent of the suppressed transcript.
 
 
 85
 Although the government's reliance on the Gallagher confession at the civil trial was precarious, and its arguments here lack surface appeal, it is undisputed that Carson failed to object to the use of the Gallagher confession when it was accepted into evidence at the civil trial on December 30, 1991. Carson argues with reason that this failure to object was excusable because the wiretap tapes themselves had not yet been ruled inadmissible by the Third Circuit. The district court declined to reach the issue of whether Carson had effectively waived his right to object to the Gallagher confession when Carson failed to object on December 30, 1991 (the date on which the government indicated it would request a ruling on the admissibility of Gallagher's criminal trial testimony).[11] Rather, the district court "assume[d], without holding", that the objection would have been timely nevertheless if made in appellant's August 25, 1992 brief concerning the effect of the Third Circuit's suppression of the wiretap tapes themselves. Carson IV, 831 F.Supp. at 172 n. 4. In that brief, however, Carson sought the blanket exclusion of "all evidence derived" from the suppressed wiretap tapes, without further specification. The district court did not err in concluding that so vague a statement was insufficient to alert either the district court or opposing counsel as to the specific nature of Carson's objection, particularly given the government's insistence in its brief that the Gallagher confession was not precluded by Sec. 2517. The length of the trial, the subtle character of the evidentiary issues posed by the Gallagher confession, and the critical character of this evidence to this defendant, reinforce the need for an unambiguous objection, particularly since the district court solicited briefing on the ramifications of the Third Circuit decision.
 
 
 86
 Federal Rule of Evidence 103(a)(1) limits a claim of error premised on the admission of evidence to instances where the evidence affects a party's substantial rights and "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context...." See also Fed.R.Civ.P. 46. Rule 103 is designed to bring objections to the attention of the court and the opposing party at the earliest possible time so as "to alert [the court] to the proper course of action and enable opposing counsel to take proper corrective measures." Notes of the Advisory Committee on the 1972 Proposed Rules, Rule 103(a)(1). See also United States v. Heinemann, 801 F.2d 86, 96 (2d Cir.1986) (under Rule 103 evidence was properly received because "no immediate objection" had been made), cert. denied, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987). Thus, under Rule 103, "neither the trial court, on a motion for a new trial, nor the appellate court, on appeal, will ordinarily take note of errors that were not pointed out to the district court judge by the party at the proper time." 9A C. Wright & A. Miller, Federal Practice and Procedure Sec. 2472 at 95 (1995).
 
 
 87
 The civil rules do not specifically authorize plain error review of evidentiary issues. Compare Fed.R.Crim.P. 52(b) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). Occasionally this court has been willing to apply the plain error doctrine to its examination of jury instructions and interrogatories in civil cases. See Abou-Khadra v. Mahshie, 4 F.3d 1071, 1078 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1835, 128 L.Ed.2d 463 (1994). Nevertheless, it is a doctrine that should only be invoked with extreme caution in the civil context. See Brenner v. World Boxing Council, 675 F.2d 445, 456 (2d Cir.) (plain error review is only appropriate in the civil context where the "error [is] so serious and flagrant that it goes to the very integrity of the trial" (citations and internal quotations omitted)), cert. denied, 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982). An objection to the Gallagher confession timely made might have justified or required its exclusion. We conclude, however, that any error that might have occurred would not rise to plain error because it cannot be said that the integrity of this civil trial was impaired. The challenged ruling was evidentiary, and the evidence was properly admitted when offered. After the Third Circuit opinion came down, the district court acted with fairness by soliciting retroactive objections. No specific objection was offered in response to this solicitation, a lapse that is not attributable to an error by the court. We therefore need not reach the issue of whether the plain error doctrine applies in the circumstances presented to us in this appeal.
 
 
 88
 F. Conduct of the Trial.
 
 
 89
 Carson challenges a host of decisions and acts by the district court during the course of the proceedings, and claims entitlement to a new trial. In these inquiries, we keep in mind that "[a] district judge has considerable discretion in the conduct of a trial," Boyle v. Revici, 961 F.2d 1060, 1064 (2d Cir.1992), that "an appellate court will not retroactively substitute its discretion for that of the trial judge unless there has been a showing of abuse," Dabney v. Montgomery Ward & Co., 761 F.2d 494, 499 (8th Cir.), cert. denied, 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985), and that minor trial errors only require a reversal if the litigant can establish that he has been prejudiced; litigants are entitled to a "fair, as opposed to a perfect trial." Zinman v. Black & Decker (U.S.), 983 F.2d 431, 436 (2d Cir.1993) (citations and internal quotations omitted). We have carefully reviewed all of Carson's challenges and find them to be unpersuasive. We discuss the more significant ones below.
 
 
 90
 First, Carson contends that the government was permitted to present evidence in a way that unfairly induced Carson into absenting himself from key portions of the trial. The transcript of the proceedings does not support this contention. While it is true that neither Carson nor his counsel was present for most of the trial, that was by choice. On one occasion, the court warned Carson's counsel that the decision not to attend all trial sessions was "a decision of your own choosing. You are certainly free to attend all of the sessions of the trial and/or if not to attend, to get the transcript. I just want the record to be clear that counsel has made the decision not to familiarize himself with the case to this point." JA at 330.
 
 
 91
 Second, Carson claims that the government promised to present its proof against him in a compact manner, and broke that promise. The government never made such a broad undertaking; rather, it undertook to make a compact presentation against Carson with respect to an embezzlement charge. Since the government never called any live witness directly relevant to this embezzlement issue, it would be incorrect to conclude that the government violated its pledge.
 
 
 92
 Third, Carson claims that the district court should have declared a mistrial after the Third Circuit issued its decision vacating Carson's conviction in the criminal case. We review the district court's decision to deny this request for abuse of discretion. See United States v. Anzalone, 626 F.2d 239, 246 (2d Cir.1980). Carson reasons that the record of the trial was "skewed by the futility of [his] challenging government evidence or offering his own evidence with respect to any issues raised in the criminal trial." Brief of Appellants at 43. The Third Circuit decision no doubt changed the calculus of the civil trial; but Carson has not identified what additional evidence he is or would have been prepared to offer. The district court did not abuse its discretion by rejecting Carson's motion for a mistrial.
 
 
 93
 G. The ERISA Claims.
 
 
 94
 Carson and his wife challenge the district court's dismissal of their ERISA claims against the union. Their arguments concerning the Gallagher confession and various procedural errors are addressed in Sections E and F, above.
 
 
 95
 The Carsons' remaining arguments require some brief background to the ERISA claim. After Donald Carson was forced to resign his post following the 1988 criminal conviction, he applied for a pension from Local 1588. The Local's bylaws, adopted in 1972, provided:
 
 
 96
 All elected officers and Business Agents who have served twelve (12) uninterrupted years of service to the Local Union shall receive a pension until their demise from the Local Union of forty (40%) percent of their last year's base pay.... After [death], half of his pension goes to his widow until she remarries or dies.
 
 
 97
 JA at 1165. Donald Carson evidently qualified for this pension by virtue of his service as the union's elected Secretary-Treasurer for more than twelve years, and he began receiving monthly payments. Several months later, however, the union reassessed the situation, concluded that the payments were not proper, and subsequently ceased making them. The Carsons initiated their lawsuit in New Jersey federal court. The action was subsequently transferred to the Southern District of New York and consolidated with the RICO civil suit.
 
 
 98
 The district court denied the Carsons' motions for summary judgment in 1991. See Carson I, 769 F.Supp. 141.[12] In so doing, the district court classified the pension claimed by Carson as a "top-hat" pension plan, which (in ERISA terms) is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. Sec. 1081(a)(3). See Id. at 144. The court concluded that such "top-hat" plans were exempt from the non-forfeiture and non-alienation rules which apply to most employee-pension plans under ERISA. Carson I, 769 F.Supp. at 145. Most significantly, the court also held that the union could obtain forfeiture of Carson's benefits if it could demonstrate that Carson had breached a fiduciary duty to the pension plan. Id. On appeal, the Carsons do not challenge (and we therefore have no cause to question) these preliminary findings and conclusions.
 
 
 99
 After the civil RICO trial, the district court concluded that Carson's participation in the MOTBY scheme constituted such a breach of fiduciary duty. Carson II, 812 F.Supp. at 1333. The Carsons challenge that finding as clearly erroneous.
 
 
 100
 The district court did not err in concluding that Donald Carson owed a fiduciary duty to the union. For purposes of ERISA, Donald Carson was the pension plan's administrator. Under 29 U.S.C. Sec. 1002(16)(A)(ii), where a pension plan fails to designate an administrator, as was the case here, the "plan sponsor" is deemed to be the "administrator." The "plan sponsor," in turn, is the "employer." 29 U.S.C. Sec. 1002(16)(B). Finally, the employer is "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan." 29 U.S.C. Sec. 1002(5). As the union's Secretary-Treasurer, Donald Carson fits this definition. As the plan administrator, Donald Carson owed a broad fiduciary duty to the pension fund. 29 U.S.C. Sec. 1002(21)(A).
 
 
 101
 The district court's finding that Donald Carson's activities hurt the union were supported by sufficient evidence, of which the Gallagher confession was only part. It is true that diminished employment opportunities for deep-sea longshoremen were offset in one sense by increased employment for warehouse laborers. However, the warehouse laborers earned less, and the union collected two percent of its members' salaries as dues. In this way, the MOTBY scheme hurt the union treasury. The district court specifically rejected the Carsons' contention that Local 1588's deep-sea laborers were fully employed during the time of the MOTBY scheme and, therefore, could not have been hurt by use of the mixed labor force. See Carson IV, 831 F.Supp. at 175.
 
 
 102
 Top-hat pension plans are not funded separately from the union treasury; consequently, any act that hurt the union hurt the pension fund. Donald Carson breached his fiduciary duty to the fund by hurting the fund he was charged to administer.
 
 
 103
 Next, the Carsons argue that the union's remedy for his alleged breach of his fiduciary duty should have been limited to a set-off no greater than the amount the union can establish Carson harmed the union. Carson cites no cases to support this proposition. Under 29 U.S.C. Sec. 1109(a), a person who breaches a fiduciary duty to a pension plan "shall be subject to such ... equitable or remedial relief as the court may deem appropriate." The power of the courts to fashion this equitable remedy is broad, see Crawford v. La Boucherie Bernard, Ltd., 815 F.2d 117, 119 (D.C.Cir.), cert. denied, 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 355 (1987), and is not exceeded here.
 
 
 104
 H. Costs.
 
 
 105
 Finally, Carson challenges the taxation of costs against him without due consideration of his timely served objections.
 
 
 106
 Federal Rule of Civil Procedure 54(d) states that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." The Rule authorizes the taxation "by the clerk on one day's notice." However, under Rule 6(e), parties are given three additional days to respond when notice is sent by mail. Under Rule 11(b) of the Southern District's local rules, the taxing of costs is confided to the discretion of the Clerk in the absence of a timely objection to the bill of costs:
 
 
 107
 A party objecting to any cost item may serve objection in writing prior to or at the time for taxation. The clerk will proceed to tax costs at the time noticed and allow such items as are properly taxable. In the absence of objection, any item listed may be taxed within the discretion of the clerk. The taxation of costs by the clerk shall be final unless modified on review by the court on motion filed within five (5) days thereafter pursuant to Rule 54(d) of the Federal Rules of Civil Procedure.
 
 
 108
 The bill of costs was mailed on December 13, 1993. Under the one-day provision of Rule 54(d) and the three-day provision of 6(e), Carson had until December 17, 1993 to respond. His objections were timely filed on the 17th. The court clerk erred by assessing costs on the morning of the 17th without awaiting the arrival of any objection from Carson. The abuse of discretion standard noted in rule 11(b) therefore did not apply. The district court should have either (a) remanded the determination of costs to the clerk for proper consideration in light of Carson's objections or (b) reviewed Carson's challenge to the clerk's assessment of costs de novo. We therefore vacate the assessment of costs and remand with instructions to do (a) or (b).
 
 
 109
 I. Other Issues.
 
 
 110
 We have carefully considered appellants' other challenges to the judgment and find them to be without merit.
 
 Conclusion
 
 111
 In sum, we affirm in all respects, except that we vacate the order of disgorgement and the order to pay costs, and remand for consideration consistent with this opinion.
 
 
 
 [1]
 Throughout this opinion Donald J. Carson shall be referred to as "Carson", while any reference to his wife, Peggy Carson, shall be through use of her full name
 
 
 [2]
 In November 1982, Local 1587 was consolidated into Local 1588. Carson retained his leadership position in Local 1588
 
 
 [3]
 Carson v. Local 1588, Int'l Longshoremen's Ass'n, 769 F.Supp. 141 (S.D.N.Y.1991) ("Carson I "); United States v. Local 1804-1, Int'l Longshoremen's Ass'n, 812 F.Supp. 1303 (S.D.N.Y.1993) ("Carson II "); United States v. Local 1804-1, Int'l Longshoremen's Ass'n, 1993 WL 77319 (S.D.N.Y. March 15, 1993) ("Carson III "); United States v. Local 1804-1, Int'l Longshoremen's Ass'n, 831 F.Supp. 167 (S.D.N.Y.1993) ("Carson IV "); United States v. Local 1804-1, Int'l Longshoremen's Ass'n, 831 F.Supp. 177 (S.D.N.Y.1993) ("Carson V ")
 
 
 [4]
 In its original liability opinion the district court found that between 1978 and 1988 Carson received reimbursement for more than $75,000 in business expenses from Local 1588's treasury and that Carson alone approved these reimbursements, in violation of the ILA's stated approval procedures. Carson II, 812 F.Supp. at 1329-30. Upon reconsideration, the district court withdrew these findings. See Carson IV, 831 F.Supp. at 174
 
 
 [5]
 There is actually some dispute as to when the Clerk's office received the Notice of Appeal. The Notice is stamped January 7, 1994. But the Carsons concede it was not mailed from New Jersey until January 7, making the January 7 stamp an evident error. A certified mail return receipt was stamped January 12, 1994. The district court found as a matter of fact that January 12 was the date the Notice was received by the Clerk's office. There is no reason to disturb this factual finding
 
 
 [6]
 We take judicial notice of the fact that on Friday, January 7, 1994, the New York metropolitan area was hit by in a major snowstorm in which airports were closed or experienced delays and "highways around New York City were coated in an icy crust." Roger Atwood, Storm Socks U.S. Northeast With Snow, Sleet and Ice, Reuters, Jan. 7, 1994, available in LEXIS, News Library, CURNWS File
 
 
 [7]
 Subsequent to the November 12, 1993 issuance of a final judgment this case was reassigned to Southern District Judge Martin, who considered appellant's Rule 4(a)(5) motion
 
 
 [8]
 The $60,000 figure represents approximately one-fifth of the total salary Carson collected while he was receiving a full-time salary yet working only part-time
 
 
 [9]
 It is actually somewhat unclear whether the Carson's double jeopardy challenge is targeted solely against the disgorgement order or also against the requirement that Carson pay costs. In any event, we reject Carson's double jeopardy challenge in its entirety
 
 
 [10]
 As originally filed on September 10, 1993 and as modified on November 5, 1993 by the addition of the emphasized language, the order enjoins Carson (and three other defendants):
 
 
 [1]
 from committing any acts of racketeering activity, as defined in Section 1961 of Title 18 of the United States Code; and
 
 
 [2]
 from having any dealings, directly or indirectly, with any members or associates of organized crime for any commercial purpose concerning the affairs of the Port of New York and New Jersey (the "Waterfront") or any labor organization; and
 
 
 [3]
 from having any dealings, directly or indirectly, with any other defendant in this action for any commercial purpose concerning the affairs of the Waterfront or any labor organization; and
 
 
 [4]
 from participating in any way in the affairs of or having any dealing, directly or indirectly, with (i) any labor organization, including without limitation, the ILA and the ILA-related entities, including, but not limited to, any ILA district councils, any ILA locals, or any ILA-affiliated benefit funds; (ii) any officer, agent, representative, employee, or member of ILA Locals 1804-1, 1588, 1814, 1809, 824 or 1909; (iii) any other officer, agent, representative, employee, or member of the ILA or any other labor organization provided, however, that nothing in this judgment shall prohibit Donald Carson from (a) making an application for or receiving a Service Retirement Pension from the NYSA-ILA Pension Trust Fund ("NYSA-ILA Pension Fund") in the form of monthly payments commencing on or after the first day of the month following his 62nd birthday, or from communicating with the NYSA-ILA Pension Fund concerning these pension payments; (b) making an application for or receiving pension proceeds from the GA 1837 Fund established by the ILA for employees of the International (the "GA 1837 Fund"), or from communicating with the administrator of the GA 1837 Fund concerning that pension; (c) permitting any non-Waterfront business that employs Donald Carson from deducting money from his wages and from remitting such money to non-ILA-affiliated labor organization as dues or fees to ensure that Donald Carson is not discriminated against on account of his failure to join a union in accordance with 29 U.S.C. Sec. 158(a)(3); (d) seeking and receiving benefits provided for by a collective bargaining agreement binding on any non-Waterfront business that employs Donald Carson or provided for by an ERISA-protected employee benefit plan established by that non-Waterfront business; or (e) initiating litigation against any entity affiliated with the ILA or the Waterfront provided that a copy of the complaint in such proceeding (with a cover letter identifying this action) is furnished by Donald Carson to the United States Attorney for the Southern District of New York upon the commencement of such litigation concerning the affairs of such organization or the Waterfront; and
 
 
 [5]
 from visiting the site of any ILA entity or other labor organization or communicating with any person who is at the site of any ILA entity or other labor organization
 JA at 578-79, 586-87.
 
 
 [11]
 In its brief, the government presents a strong argument that the objection was waived in December 1991. See Brief of Appellant at 28-29. Nevertheless, because Carson also failed to make a specific objection in August 1992 (when Carson filed a brief concerning the Third Circuit's decision in his criminal case), the issue of whether waiver took place in December 1991 need not be resolved on appeal
 
 
 [12]
 There was some debate involved in that summary judgment motion as to whether the bylaws which provided for the pension had ever been ratified by the union membership. The union was unable to locate important documents relevant to this determination. The district court, therefore, concluded that the union "had conceded that a pension plan was established, as defined under ERISA." Carson I, 769 F.Supp. at 144