**In re E.L. CARLYLE, Debtor.**

**Norfolk Shipbuilding & Drydock Corporation, Plaintiff,**

**v.**

**E.L. Carlyle, Defendant.**

**Bankruptcy Nos. 99–23781–S, CMN 99–1560–S.**

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

Dec. 17, 1999.

C. Grigsby Scifres, Virginia Beach, VA, for debtor.

## MEMORANDUM OPINION & ORDER

STEPHEN C. ST. JOHN, Bankruptcy Judge.

This Motion for Relief from Automatic Stay of Norfolk Shipbuilding & Drydock Corporation ("NSDC") against the debtor, E.L. Carlyle ("Carlyle"), came on for final hearing on September 30, 1999. After taking the matter under advisement, the Court renders the following Memorandum Opinion, which constitutes its findings of fact and conclusions of law.

### FINDINGS OF FACT

NSDC's motion for relief ("Motion") alleges that, on June 29, 1990, Marepcon Financial Corporation, doing business as Norshipco Financial Corporation ("Norshipco Financial"), loaned to Bleeker St. Publishing ("Bleeker") $385,000.00. Bleeker made and Carlyle endorsed a commercial note ("Bleeker St. Note") that evidenced Norshipco Financial's loan. At the time Carlyle entered into the loan with Norshipco Financial, NSDC operated Norshipco Financial as a wholly owned subsidiary. The Motion further alleges that Carlyle and his wife made a security agreement, dated February 10, 1993, in favor of Norshipco Financial wherein the Carlyles' interest in a deferred compensation agreement executed on May 17, 1976 ("Deferred Compensation Plan No. 1") and a key management personnel leveraged deferred compensation agreement executed on September 1, 1985 ("Deferred Com-

pensation Plan No. 2"). Additionally, NSDC established an officers retirement plan dated December 1, 1989 ("Retirement Plan") to provide supplemental income to Carlyle after his retirement at age 65. NSDC alleges that Carlyle has been receiving payments from NSDC under each of these plans (Deferred Compensation Plan No. 1, Deferred Compensation Plan No. 2, and the Retirement Plan are sometimes collectively referred to as the "Plans").

The Motion further alleges that, in February 1994, Norshipco Financial ceased operations and transferred its non-performing assets, including the Bleeker St. Note, to NSDC. On April 11, 1996, NSDC advised Carlyle that NSDC's Board of Directors had authorized the demand for payment in full of the Bleeker St. Note. Thereafter, NSDC demanded payment and, on June 7, 1996, advised Carlyle of its intention to apply the monthly payments due under the deferred compensating plans to repay the Bleeker St. Note. NSDC alleges that, pursuant to 11 U.S.C. § 506(a), it is entitled to setoff the amounts that NSDC owes Carlyle under the Plans against the amounts Carlyle owes under the Bleeker St. Note. NSDC further claims that its interest in the Plans is not being adequately protected, constituting cause to grant relief from the automatic stay, pursuant to 11 U.S.C. § 362(d)(1), to permit NSDC to offset the payments due to Carlyle under the Plans. Alternatively, NSDC alleges that grounds exist, pursuant to 11 U.S.C. § 362(d)(2), to grant relief from the automatic stay as NSDC claims that there is no equity in the Plans for the benefit of Carlyle's creditors and that the Plans are not necessary for Carlyle's effective reorganization.

In his answer to the Motion, Carlyle denies NSDC's right to offset the amounts owed him under the Plans, and affirmatively asserts as defenses: (i) NSDC is not a holder or owner of the Bleeker St. Note

and therefore is not entitled to enforce same; (ii) the Plans themselves, by their language, prohibit setoff or encumbrance; and (iii) that any setoff by NSDC would constitute a breach of its fiduciary duties under the Plans.[1]

NSDC and Carlyle entered into an extensive stipulation for the purposes of the final hearing on the motion for relief. They agree that Carlyle is liable as an endorser of the Bleeker St. Note. As of June 8, 1999, $435,057.78 in principal and unpaid interest was due and payable under the Bleeker St. Note, exclusive of late charges, attorney's fees and collection costs. The parties also agree that NSDC had established Deferred Compensation Plan No. 1, Deferred Compensation Plan No. 2, and the Retirement Plan, which were paying monthly amounts as follows prior to the exercise of NSDC's offset:

| | |
|---|---|
| Deferred Compensation Plan No. 1 | $1,250.00 |
| Deferred Compensation Plan No. 2 | $3,333.33 |
| Retirement Plan | $7,459.00 |

The aggregate amount of benefits payable to Carlyle under Deferred Compensation Plan No. 1 and Deferred Compensation Plan No. 2, without any reduction to present value, total $300,806.00. The benefits under Deferred Compensation Plan No. 1 terminate in 19 months and the benefits under Deferred Compensation Plan No. 2 end in 79 months. The payments to Carlyle under the Retirement Plan terminate upon Carlyle's death.

Daniel Cotter ("Cotter"), a senior vice president of NSDC, testified as to the circumstances under which NSDC alleges it became the owner of the Bleeker St. Note. Prior to 1991, Norshipco Financial, was a separate corporation wholly owned by NSDC. In July 1991, NSDC created another subsidiary corporation, Flagship Financial, to which it contributed the performing assets of Norshipco Financial totaling approximately 7.5 million dollars. Norshipco Financial's remaining assets were transferred to NSDC in February 1994. Among these remaining assets was the Bleeker St. Note. As proof of the transfer, Cotter offered into evidence an exhibit titled "Consolidated Schedule—Balance Sheet Information Year Ended 1993". The exhibit contains a column labeled "Notes" that indicates a value of "$385,000" among the assets of Norshipco Financial. Cotter stated this value was attributable to the Bleeker St. Note. Based on the foregoing, Cotter represented that, as of December 31, 1993, Norshipco Financial, the original obligee, owned the Bleeker St. Note. Cotter also offered into evidence a NSDC balance sheet reconciliation comparing its financial position as of February 1994 with February 1993. The exhibit presents a column of notes receivable, including one depicted as "Bleeker Street Pub." The value for the note receivable of "Bleeker Street Pub" is shown as "0" for 1993 and "$385,000" for 1994. Based on this balance sheet reconciliation, Cotter testified that Norshipco Financial transferred the Bleeker St. Note to NSDC as of February 1994.

Cotter also testified that each of these account records were part of NSDC's company records and maintained as such. Cotter did indicate that the Bleeker St. Note was not endorsed to NSDC, but maintained it was physically delivered to NSDC and is maintained in his files there. Under cross-examination, Cotter acknowledged a letter sent on June 8, 1999 to Carlyle's counsel in which Cotter stated "[a]ccording to my records, the debt is owed to Norshipco Financial Corporation, a wholly owned subsidiary of Norfolk Shipbuilding & Drydock Corporation." Carlyle's testimony apart from the exhibits

---

1. Carlyle also included other defenses in his answer, including that the statute of limitations bars enforcement of the Bleeker St. Note and that NSDC has no valid security interest in the amounts owed under the plans. These defenses were waived by stipulation and were not raised at trial.

added little to the Court's enlightenment, as he indicated he corresponded with NSDC representatives concerning the Bleeker St. Note in 1996, but ultimately did not know who owned the instrument.

Following the parties' joint presentation of the stipulation and their evidence at the final hearing, several issues remain for the Court to resolve: 1) Was the Bleeker St. Note transferred from Norshipco Financial to NSDC so as to validly convey to NSDC the right to enforce the Bleeker St. Note; 2) Assuming valid transfer, are the debts Carlyle owes to NSDC, under the Bleeker St. Note, and NSDC owes to Carlyle, under the Plans, due and owing in the same capacity so as to permit NSDC the right to setoff; 3) Did NSDC's inclusion of anti-alteration provisions in the Plans, waive its right to setoff; 4) Assuming the answer to the inquiries above are in the affirmative, has NSDC met all other requirements to permit setoff; 5) Assuming NSDC is a creditor holding the security of the amounts owed to Carlyle under the Plans, is NSDC entitled to relief under either 11 U.S.C. § 362(d)(1) or (2); and 6) Is Carlyle entitled to have NSDC withhold and pay from the disbursements under the Plans any federal or state income taxes which accrue by reason of these payments?

### CONCLUSIONS OF LAW

### I.

### Was the Bleeker St. Note Validly Transferred from Norshipco Financial to NSDC?

Carlyle defends against NSDC's claimed setoff right, in part, by asserting that NSDC is not the owner of the Bleeker St. Note. Carlyle claims that there is insufficient evidence before the Court of the occurrence of the Bleeker St. Note's transfer of ownership to find NSDC is the instrument's owner. Carlyle asserts that, therefore, NSDC is not entitled to setoff

the obligations thereunder against the payments owed to Carlyle under the Plans. Carlyle offers the Norshipco Financial did not endorse the Bleeker St. Note to NSDC and claims that absence of endorsement is fatal to NSDC's contention that it is the present owner of the Bleeker St. Note. NSDC responds that the documentary evidence of the two internal accounting records, along with Cotter's unequivocal testimony that physical possession had been transferred from Norshipco Financial to NSDC, adequately proved the instrument's transfer.

■ Section 8.3A–203 of the Virginia Code, as amended, controls the validity of the transfer of instruments and provides as follows:

(a) An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.

(b) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument.

(c) Unless otherwise agreed, if an instrument is transferred for value and the transferee does not become a holder because of lack of indorsement by the transferor, the transferee has a specifically enforceable right to the unqualified indorsement of the transferor, but negotiation of the instrument does not occur until the indorsement is made.

(d) If a transferor purports to transfer less than the entire instrument, negotiation of the instrument does not occur. The transferee obtains no rights

under this title and has only the rights of a partial assignee.

Va.Code Ann. § 8.3A–203 (Michie Supp. 1999). Accordingly, this section makes plain that (i) an instrument is transferred when someone other than its issuer delivers the instrument for the purpose of giving the right to enforce the instrument, and (ii) transfer of the instrument, whether or not the transfer is a negotiation, vests any right to enforce the instrument in the transferee. The Official Comment to Section 8.3A–203 echoes this plain meaning and explains the significance of effectiveness of a transfer without endorsement:

> Subsection (b) states that transfer vests in the transferee any right of the transferor to enforce the instrument "including any right as a holder in due course." If the transferee is not a holder because the transferor did not indorse; the transferee is nevertheless a person entitled to enforce the instrument under Section 3–301 if the transferor was a holder at the time of transfer. Although the transferee is not a holder, under subsection (b) the transferee obtained the rights of the transferor as holder. Because the transferee's rights are derivative of the transferor's rights, those rights must be proved. Because the transferee is not a holder, there is no presumption under Section 3–308 that the transferee, by producing the instrument, is entitled to payment. The instrument, by its terms, is not payable to the transferee and the transferee must account for possession of the unindorsed instrument by proving the transaction through which the transfer-

ee acquired it. Proof of a transfer to the transferee by a holder is proof that the transferee has acquired the rights of a holder. At that point the transferee is entitled to the presumption under Section 3–308.

Va.Code Ann. § 8.3A–203 cmt. 2 (Michie Supp.1999). Accordingly, as the Official Comment states, the absence of an endorsement does not, as Carlyle argues, deprive a transferee of the right to enforce the instrument. Rather, the absence of endorsement removes the presumptions under Section 8.3A–308 of the Virginia Code [2] and thereby requires the transferee must prove the transaction by which it acquired the instrument. It remains, then, to weigh whether NSDC has produced sufficient evidence to carry its burden to prove it is the current owner of the Bleeker St. Note.

Here, the evidence of transfer is sufficient. Cotter's testimony was unequivocal that Norshipco Financial physically delivered the Bleeker St. Note to NSDC and maintained the note in its files. More importantly, the introduction into evidence of the consolidated schedule adequately proves the transfer of the Bleeker St. Note from Norshipco Financial to NSDC.[3] Accordingly, the court finds that Norshipco Financial transferred the Bleeker St. Note to NSDC in 1994 and that NSDC is the present owner thereof.

## II

### Are the Debts Owing To Carlyle and To NSDC
### Due and Owing in the Same Capacity?

Carlyle also defends, in part, by asserting that the debts NSDC owed Carlyle

---

**2.** Virginia's enactment of UCC 3–308 referenced in the Official Comment is codified at Section 8.3A–308 of the Virginia Code. *See* Va.Code Ann. 8.3A–308 (Michie Supp.1999).

**3.** The balance sheet information for NSDC for 1993 NSDC introduced into evidenced showed a value of "$385,000" for notes re-

ceivable for Norshipco Financial and the NSDC balance sheet reconciliation showed a "0" balance for the Bleeker St. Note in 1993 and a "$385,000" balance for 1994. NSDC's introduction of this information, which Carlyle did not contest as to its accuracy, is sufficient to prove the transfer.

under the Plans are owed to him in a fiduciary capacity by NSDC, which thereby prohibits NSDC's exercise of setoff. More specifically, Carlyle asserts that the monies he owes to NSDC under the Bleeker St. Note were incurred in a non-fiduciary capacity; in contrast, Carlyle believes that the NSDC actively administers the Plans and that NSDC, under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), owes a fiduciary duty to the plan participants, including Carlyle. Therefore, Carlyle contends, if NSDC is a fiduciary under the terms and conditions of ERISA, NSDC would owe any monies owing to Carlyle under the Plans in a fiduciary capacity. This would prohibit NSDC from offsetting the monies owed to Carlyle under the Plans against the monies Carlyle owes to NSDC under the Bleeker St. Note.

■ Section 553 of the Bankruptcy Code provides in pertinent part that "[e]xcept as otherwise provided in this section and in Sections 362 and 363 of this title, this title does not effect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before commencement of the case under this title against a claim of such creditor against the debtor that arose before commencement of the case ..." 11 U.S.C. § 553(a) (1994). Accordingly, Section 553 preserves a creditor's right of offset to the extent such right may exist at common law. *See Durham v. SMI Indus.*, 882 F.2d 881, 883 (4th Cir.1989). Virginia law permits setoff when the claims of the parties are due and owing in the same rights and capacities. *See Mullins v. Breeding*, 167 Va. 25, 187 S.E. 466, 468 (1936). The Virginia Supreme Court has also recognized, however, that a fiduciary may not setoff a trust fund against an indebtedness owed to the trustee individually.[4]

■ In analyzing the requirement of mutuality as it applies to an entity holding an individual retirement account ("IRA"), a number of courts have prohibited a financial institution from offsetting monies deposited into an IRA against debts that the depositor owes. *See In re Mastroeni*, 57 B.R. 191, 192 (Bankr.S.D.N.Y.1986); *Hovis v. Sopkin (In re Sopkin)*, 57 B.R. 43, 48 (Bankr.D.S.C.1985); *First State Bank v. Holt (In re McDaniel)*, 41 B.R. 132, 133 (Bankr.W.D.Tex.1984); *(Dixie v. Gentry) In re Todd*, 37 B.R. 836, 837 (Bankr.W.D.La.1984); *In re Dunn*, 5 B.R. 156, 158 (Bankr.N.D.Tex.1980). The court in *Dunn* summarized the considerations dictating this result as it pertains to IRAs:

> The ... Bank is a fiduciary with the bankrupt as its beneficiary. That fiduciary capacity must predominate over any other relationship which it enjoys with the bankrupt, including the creditor-debtor relationship. As to matters within the scope of the fiduciary relationship the trustee (Bank) is under a duty not to profit at the expense of the beneficiary. It has the duty of loyalty and must administer the trust solely in the interest of the beneficiary....[That] does not mean that the beneficiary may not withdraw the monies, although there is a penalty imposed by IRS for any such withdrawal. It does mean, however, that the trust fund cannot be forfeited to the Bank and the IRA custodian is

---

4. This principle is expressed in *First National Bank v. Johnson:*

A trustee cannot set off against the trust fund held by him his individual demand against the creator of the trust. 'In this connection, equity treats the fiduciary as holding the res in a separate capacity.' One of the elementary principles of set-off is that 'The demands must be due between the same parties, and in the same right. A debt due from a partner cannot be set up against a partnership demand, nor vice versa, nor can a debt due to one as executor, administrator, or trustee, be set up against one in his own right, nor vice versa.'

*First Nat'l Bank v. Johnson*, 183 Va. 227, 31 S.E.2d 581, 585 (1944) (citations omitted).

precluded from asserting any claim to the assets in an IRA.

*Dunn,* 5 B.R. at 158.

Here, however, the relationship between NSDC and Carlyle is not founded upon an IRA. A review of the Plans indicates that, unlike an IRA, the obligations on the part of NSDC are unfunded. Each expressly states that they do not operate to create a trust of any kind or a fiduciary relationship between Carlyle and NSDC.[5] Norshipco asserts that each of the Plans is a "top hat" plan, defined by ERISA to be "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1101(a)(1) (1994). Carlyle concurs that the Plans are "top hat" plans by way of his admission in his answer to the motion for relief to NSDC's allegation.[6] The ERISA provisions expressly exempt "top hat" plans from the fiduciary, funding, participation and vesting requirements of other types of employee benefit plans. *See id.*

Several courts have recognized that ERISA expressly exempts "top hat" plans from the imposition of fiduciary requirements upon the sponsor of such unfunded deferred compensation plans. For example, in *Leonard v. Sunnyglen Corp. (In re Battram),* 214 B.R. 621 (Bankr.C.D.Cal. 1997), the debtor entered into an agreement with a long-term employee to provide monthly benefit payments. The debtor discontinued payments prior to completion and the employee sued the debtor and his corporation alleging that the debtor breached a fiduciary duty in failing to make the required payments. *See id.* at 623–25. After applying a number of tests and determining the plan in question was maintained primarily for the purpose of providing deferred compensation to a "select group" of employees which consisted only of the plaintiff, the court concluded the plan in question was a "top hat" plan and, therefore, no fiduciary duty existed on the part of the debtor. *See id.* at 625.

The Fourth Circuit Court of Appeals has catalogued the significant number of deci-

---

5. The relevant plan provisions for each of the plans is as follows:

5. Nothing contained in this Agreement and no action pursuant to the provisions of this Agreement shall create or be construed to create a trust of any kind, or a fiduciary relationship between the Corporation and the Employee, his designated beneficiary or any other person. Any funds which may be set aside, accumulated or invested in respect of this Agreement shall continue for all purposes to be a part of the general funds of the Corporation and no person other than the Corporation shall by virtue of this Agreement have any interest in such funds. To the extent that any person acquires a right to receive payments from the Corporation under this Agreement, such rights shall be no greater than the right of any unsecured general creditor of the Corporation.
Deferred Compensation Plan No. 1.
    1.4 *Nature of the Plan*
    B. Nothing in this Plan is intended or shall be construed to create any trust for the benefit of any Plan Participant or Beneficiary or to establish any mechanism pursuant to which the benefits under the Plan are funded.

Deferred Compensation Plan No. 2.
    9 *Interpretation.* (a) No provision of this Plan or action taken pursuant to this Plan shall be construed to create a trust or any kind of fiduciary relationship between the Company ant the Officer, his spouse or any other person. Any funds which may be set aside, accumulated or invested in respect of this Plan shall continue for all purposes to be a part of the general funds of the Corporation and no person other than the Corporation shall by virtue of this Agreement have any interest in such funds. To the extent that any person acquires a right to receive payments from the Corporation under this Agreement, such rights shall be no greater than the right of any unsecured general creditor of the Corporation.
Retirement Plan.

6. Paragraph 7 of the Affirmative Defenses in Carlyle's Answer provides that "The Plans are 'top hat' plans pursuant to Title 1 of ERISA, and, because the Plans contain non-alienation provisions, any setoff or attempted setoff is a breach of NSDC's fiduciary duty owed to Carlyle."

sions who have recognized the non-existence of a fiduciary duty on the part of a sponsor of a "top hat" plan in *Denzler v. Questech, Inc.*, 80 F.3d 97 (4th Cir.1996). There, an employee brought suit under ERISA challenging a denial of full early retirement benefits under a deferred compensation plan maintained by his employer. *See id.* at 99. The court contrasted the applicability of the enforcement provisions of ERISA to "top hat" plans with the fiduciary and other excepted provisions:

> Questech adopted the [deferred compensation plan] in 1986 in order to attract qualified employees and to provide a comfortable retirement for its highly compensated managers and employees. The [deferred compensation plan] was

an unfunded plan, commonly referred to as a "Top Hat" plan.... Many ERISA rules and protections that apply to funded pension benefits plans, including detailed accrual, vesting, funding, and fiduciary regulations, do not apply to Top Hat plans.... The enforcement provisions of ERISA described in 19 U.S.C. § 1132(a), however, apply to Top Hat plans.

*Id.* at 99 n. 1 (citations omitted).[7]

There is no basis for this court to conclude that NSDC owes Carlyle any fiduciary duties under the Plans that would give rise to a finding the debts due and owing to Carlyle under the Plans are of a fiduciary nature.[8] Rather, NSDC's debts to Car-

**7.** For examples of cases where ERISA rules and protections that apply to fund pension benefits plans were not applied to Top Hat plans, see *Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 935–37 (3d Cir.1985), *overruled on other grounds, Pritzker v. Merrill Lynch*, 7 F.3d 1110 (3d Cir.1993); *Kemmerer v. ICI Americas, Inc.*, 842 F.Supp. 138, 140–41 (E.D.Pa.1994), *aff'd in relevant part,* 70 F.3d 281 (3d Cir.1995); *Carr v. First Nationwide Bank*, 816 F.Supp. 1476, 1486 (N.D.Cal. 1993). Without specifically addressing the issue as to whether the sponsor of a deferred compensation plan is a fiduciary, this court has permitted the exercise of an off set by the sponsor of a deferred compensation of monies owed it by a stockbroker participant. *See Blanton v. Prudential–Bache Sec. (In re Blanton)*, 105 B.R. 321, 333 (Bankr.E.D.Va.1989).

**8.** Carlyle relies on the Second Circuit Court of Appeals case of *United States v. Carson*, 52 F.3d 1173 (2nd Cir.1995) to support the imposition of a fiduciary duty upon NSDC to bar set off Carlyle's reliance on *Carson* is misplaced. There, the United States brought an action against a former union officer under the Racketeer Influenced and Corrupt Organization Act ("RICO"). *See id.* at 1176. The court simultaneously considered the appeal of the dismissal of a complaint filed by the former union official against the union alleging ERISA violations by reason of the union's denial of a pension claim because of alleged wrongdoing on the part of the official. *See id.* The union bylaws provided for all its elected officers with twelve uninterrupted years of service to receive a pension equal to forty percent (40%) of their last year's base pay.

*See id.* at 1189. The official began receiving monthly payments, however, several months later, the union reassessed its position and ceased the distributions. *See id.* In denying a summary judgment motion by the union official, the district court found the plan .in question to be a "top hat" plan and found that the union could compel forfeiture of the official's benefits if it could demonstrate Carson had breached a fiduciary duty to the pension plan. *See id.*

After finding the official owed a fiduciary duty to the union plan by reason of his service as secretary-treasurer of the union, the court concluded that the activities in which the official which were the subject of the RICO charges could be utilized as a basis to deny the official's pension:

> The district court's finding that [union official's] activities hurt the union were supported by sufficient evidence. Top hat pension plans are not funded separately from the union treasury; consequently, any act that hurt the union hurt the pension fund. [The union official] breached his fiduciary duty to the fund by hurting the fund he was charged to administer.

*Id.* at 1189–90.

The *Carson* court found that forfeiture was warranted in an instance where a corrupt union official had committed misconduct against the plan's union sponsor. This finding does not support a general imposition of a fiduciary duty on NSDC in contradiction with the express provisions of ERISA that except deferred compensation arrangements, such as the Plans here, from the imposition of ERISA's fiduciary duties.

lyle under the Plans and Carlyle's indebtedness to Norshipco under the Bleeker St. Note are of the same nature and character for the purposes of satisfying the mutuality requirements of 11 U.S.C. § 553 and of Virginia law permitting setoff.

## III

### Do the Anti–Alienation Provisions of the Plans Constitute a Waiver of Setoff by NSDC?

■■■ Carlyle also argues that the provisions of the Plans which prohibit alienation or assignment of benefits operate to prohibit the exercise of setoff by Norshipco of payments due to Carlyle. Despite the exemption of "top hat" plans from many of ERISA's regulations, including the fiduciary requirements, the enforcement provisions of ERISA clearly permit participants in "top hat" plans to bring civil actions to recover benefits due or

otherwise enforce the terms of a plan. *See Kemmerer,* 70 F.3d at 286; *Denzler v. Questech, Inc.,* 80 F.3d at 99 n. 1; *Carr v. First Nationwide Bank,* 816 F.Supp. at 1486. Accordingly, Congress's decision to exempt "top hat" plans from certain fiduciary duties does not mean that courts may not review plan sponsors' actions. The fiduciary exemption means only that "top hat" plans are not held to the strict fiduciary standards of loyalty and care otherwise applicable to ERISA fiduciaries. *See Kemmerer,* 70 F.3d at 286. In such instances, breach of contract principles, applied as a matter of federal common law, govern disputes arising out of the plan documents. *See id.* Despite this Court's conclusion that NSDC is not a fiduciary under the Plans so as to prohibit setoff, if the provisions of the Plans themselves prohibit setoff, then Carlyle has the right to utilize the Plans' contractual terms and conditions as a bar to NSDC's attempted offset.[9] Thus, this court must review the

Carlyle also argues that the service of NSDC as the Plan administrator under the Plans combined with the broad definition of a "fiduciary" under the provisions of 29 U.S.C. § 1002(21)(A) create a fiduciary duty on NSDC's part. The argument fails in light of the express provision of ERISA excepting a "top hat" plan such as each of the Plans from the fiduciary provisions of ERISA. *See* 26 U.S.C. § 1101(a)(1).

9. A court may use both federal and state common law to a certain extent to interpret ERISA-governed plans. ERISA preempts state law to the extent that it relates to employee benefit plans. *See* 29 U.S.C. § 1144(a) (1994). In interpreting ERISA-governed plans, like the Plans at issue, courts must first look to the ERISA statute to see if a relevant provision applies. *See Singer v. Black & Decker Corp.,* 964 F.2d 1449, 1451 (4th Cir. 1992) ("[R]esort to federal common law generally is inappropriate when its application would conflict with the statutory provisions of ERISA ..."). If no relevant provision applies, the court must look to see if it can give effect to the plan's provision under the plain language of the plan. The court may look to federal common law to assist in interpretation provided the federal common law remedy proposed does not discourage employers from implementing plans governed by ERISA or

threaten to override the explicit terms of an established ERISA benefit plan. *See id.* at 1452 (quoting *Provident Life & Accident Ins. Co. v. Waller,* 906 F.2d 985, 992 (4th Cir. 1990)), *accord Phoenix Mutual Life Ins. Co. v. Adams,* 30 F.3d 554, 563 (4th Cir.1994). The court may also draw upon state common law in shaping an applicable body of federal common law provided that such state law is not expressly preempted by provisions of ERISA's statutory text and does not do violence to the policies underlying ERISA. *Phoenix,* 30 F.3d at 564 & n. 22.

ERISA is silent on the issue of when the language of a plan permits offset. Thus, the Court must look to the plain language of the Plans at issue to determine whether they permit offset. As a general matter, it appears that finding, as a matter of federal common law, that plan language must be explicit in order to prohibit waiver would not discourage employers from implementing ERISA-governed plans as it would prevent employers from waiving their right to offset without intent manifested by express language in the plan providing for such waiver. Furthermore, strictly interpreting plan language regarding waiver would not threaten to override explicit plan terms; on the contrary, permitting too liberal an interpretation of plan language as to offset could threaten to

892

Plans to determine if the Plans' provisions themselves prevent the offset sought by NSDC.

■ Contracting parties may preclude setoff between them by agreement. *See In re Blanton*, 105 B.R. at 335 (citing 80 C.J.S. *Set–Off and Counterclaim* § 14 (1953)). Although some decisions suggest setoff waiver provisions may be express or implied, courts have also held that waiver cannot be inferred from equivocal language nor deduced from ambiguous expressions. *See id.* (citing *Armour & Co. v. Whitney & Kemmerer, Inc.*, 164 Va. 12, 178 S.E. 889, 893 (1935)). In *In re Blanton*, this Court considered whether language in a deferred compensation plan which stated a participant's interest "may not be assigned, pledged, transferred, alienated or otherwise disposed of, or subjected to garnishment, bankruptcy proceeding, transfer by operation of law, or legal process" constituted a waiver of or prohibition against the exercise of setoff by the participant's employer. After considering the decisions denying setoff to a creditor holding an IRA or a special purpose account, this Court concluded "that the ... plan restrictions on alienation or prohibition of transfer by operation of law are not sufficiently precise to preclude the company's right of setoff in [the employee's] deferred compensation agreement." *Id.* at 336.[10]

Few cases have found contractual language to be sufficiently specific and precise to constitute a waiver of setoff. In *Silbert v. Silbert*, 85 A.D.2d 661, 445 N.Y.S.2d 215 (N.Y.App.Div.1981), the guarantors of a certain promissory note executed a document containing the following language:

> No setoff, counterclaim or defense of any kind or nature which any of the undersigned has, or may have had, against [Henry] Silbert may be asserted as a defense to the undersigned's obligations hereunder, but each of the undersigned reserves and shall have the right to assert any such setoff, counterclaim or defense in a separate action against [Henry] Silbert.

*Id.* at 216. This explicit language was found to bar the exercise of an attempted setoff by the note guarantors.

In *Armour and Company*, an agreement was made for the delivery of coal to the defendant, which provided for the delivery of seven cars of coal to the defendant each week, with one to be credited to the coal company's account and six to be paid for upon the receipt of the invoice. *See Armour*, 178 S.E. at 890. Remittance was to be made by the defendant directly to the plaintiff. Armour and Company, who was acting as the exclusive agent for the coal company. *See id.* After discontinuance of the agreement to ship coal, Armour and Company requested payment and the defendant deducted from the amount due it from the coal company. *See id.* at 891. The Virginia Supreme Court found the contractual language sufficient to manifest a waiver of setoff:

> It ... seems perfectly obvious that it was the intention of the parties that up to the time the contract should be discontinued for one of the causes above mentioned. Armour and Company was to apply the value of only one car a week

imply a waiver of offset rights in instances in which the parties' never intended, nor even contemplated, such a waiver.

**10.** Carlyle is correct that this Court, in finding that setoff was permitted in *In re Blanton*, relied in part upon the fact that, there, the debtor was eligible to receive the amounts due him under the plan in question because

of his termination of employment, negating the plan's prohibition against alienation. However, a reading of *In re Blanton* suggests the primary basis for the court's conclusion was its determination that the language relied upon by Blanton was too imprecise to find offset had been waived.

to the liquidation of their account against the Norton Coal Company, and to pay for the other six cars of coal per week in cash. The express language is: 'the other six to be paid for by you upon receipt of invoice and not to be credited against the now standing account of the Norton Coal Company.'

In the instant case Armour and Company was willing to assist Norton Coal Company in disposing of its products, in order to enable it to collect its account. The Norton Coal Company was willing to apply as much of its product as it could spare to the payment of the Armour and Company debt, in consideration of the fact that Armour and Company assisted it in disposing of some of its coal. The parties thereupon got together upon this agreement, which they considered to be their mutual advantage. This being the case it seems to us that by express agreement Armour and Company are barred from offsetting its claim against this particular account for the coal slipped it, and that there was a valuable consideration for such waiver, as held by the trial court.

*Id.* at 893.

Few decisions have suggested that anti-alienation language as typically provided for in an ERISA plan is sufficient to be considered as a contractual waiver of the right to setoff. In *In re Mastroeni*, a bank sought setoff of an IRA. While also finding there was a lack of mutuality permitting offset because the bank held the individual retirement account monies as a trustee, the court there also held the IRA was a special purpose account which prohibited setoff.[11]

■ Based on these cases, the court must review the specific provisions of the Plans and search for their plain meaning to conclude whether any of them are sufficiently precise and express to bar NSDC from setoff. The language of the Retirement Plan, which provides that "[t]he right of the Officer as any other person to the payment of a benefit hereunder shall not be assigned, transferred, pledged, encumbered or subject to any form of attachment," is too imprecise to find it as a bar to offset. Rather, it appears to be language of a standardized nature found in all ERISA plans to prevent the imposition of an immediate taxable event upon the participation. *See In re Blanton*, 105 B.R. at 333 ("It is beyond question that the type of non-assignability or non-alienation language that appears in deferred compensation agreements as well as in individual retirement accounts and qualified pension or profit sharing plans may be broadly stated to be for the purpose of deferring a participant's income tax"). Deferred Compensation Plan No. 2 contains language that is highly similar to that of the Retirement Plan: "The right of the Employee or

11. The court in *Mastroeni* specifically found: [I]n the instant case it is true that the IRA account is not an immobilized account and the funds may be withdrawn by the debtor at will, subject to a tax penalty for early withdrawal. Nonetheless, the debtor's IRA account was designated for an agreed statutory special purpose when the debtor and Trust Company contracted ... that the funds in the debtor's IRA account "shall not be subject to ... legal or equitable process, except by the Custodian for its fees and other expenses ... except to the extent required by law." .... The parties also expressly agreed that Trust Company would act as custodian for the debtor's IRA funds and would not divert the funds for any other purpose. Indeed ... the custodial agreement specifically declares that the IRA funds will not be "diverted to purposes other than the exclusive benefit of the Individual and his Beneficiary, except as required by law." *Mastroeni*, 57 B.R. at 194. *See also In re Todd*, 37 B.R. at 837 ("Although the issue of the court [sic] can be clearly resolved due to a lack of mutuality of debt, [the] contractual agreement between the Bank of Dixie as Trustee and [the debtor] would prevent the Bank of Dixie, either as trustee or as a third party from [offset])."

any other person to the payment of benefits under this Agreement shall not be assigned, transferred, pledged or encumbered except by will or by the laws of descent and distribution." This language, too, fails to express a sufficiently concrete intention to prohibit offset to cause a bar to NSDC.

The more extensive provision of Deferred Compensation Plan No. 1 is more problematic.[12] While most of this section mirrors the somewhat standard tax-driven anti-alienation language of the other two Plans, the second sentence requires additional scrutiny in its prohibition of the imposition of liability upon any interest of a participant. This provision appears better read to be an amplification of the anti-alienation language of the first sentence of this section rather than a manifest expression of the parties of an intent to waive setoff. This sentence more logically would seek to prohibit execution on the interest of a participant in this plan by a third party as opposed to prohibition of setoff by the plan sponsor. While closer than the other plan language upon which Carlyle relies, this provision too fails to be sufficiently specific and clear to permit this court to conclude that it operates to contractually thwart any offset by NSDC. Accordingly, there appears to be no contractual bar to NSDC's setoff of monies due to Carlyle under the Plans.

## IV

### Have All Other Requirements To Permit Setoff by NSDC Been Satisfied?

As earlier noted, Section 553 of the Bankruptcy Code merely preserves the right of setoff as it exists under state law. In Virginia, setoff is recognized as:

> a counter demand of a liquidated sum growing out of a transaction extrinsic to the plaintiff's demand, for which an action on contract might be maintained by the defendant against the plaintiff and which is now exhibited by the defendant against the plaintiff for the purpose of counterbalancing in whole or in part the plaintiff's demand, and, where it exceeds the plaintiff's demand of recovering a judgment in his own favor for the excess.

*National Bank and Trust Co. v. Castle,* 196 Va. 686, 85 S.E.2d 228, 233 (1955). In order for setoff to apply, the following must be proven: "1. that the creditor holds a 'claim' against the debtor that arose prepetition; 2. that the creditor owes a 'debt' to the debtor that also arose prepetition; 3. that the claim and the debt are mutual; and 4. that the claim and the debt are each valid and enforceable." *King v. Fulbright & Jaworski, LLP (In re Koch),* 224 B.R. 572, 575 (Bankr.E.D.Va.1998) (quoting 5 Collier on Bankruptcy, ¶ 553.01[1], at 553–57 (Lawrence P. King et al., eds., 15th ed. Rev.1997)).

Here, it is apparent that NSDC holds a claim that arose substantially prepetition against Carlyle by reason of the Bleeker St. Note. It is also uncontested that NSDC owes Carlyle certain benefits which are paid monthly under the Plans. While Carlyle raised a number of defenses to the validity and enforceability of the Bleeker St. Note in his response to the motion for relief, he abandoned each of these defenses prior to the conduct of the final hearing.

12. Deferred Compensation Plan No. 1 provides, in relevant part:

No right or interest of any Participant or Beneficiary of any Participant to any benefit payable under this Plan shall be assignable or transferable or subject to any legal lien or process including, without limitation, execution, levy, garnishment, attachment or pledge. To the extent provided by law, no right or interest of any Participant or Beneficiary to or in any of the benefits payable under this Plan shall be liable for or subject to any obligation or liability of such Participant or Beneficiary. No Participant or Beneficiary shall have any right to assign anticipatorily or otherwise transfer any future benefits to which the Participant may be entitled under the Plan.

The only defenses Carlyle chose to offer at trial were that NSDC is not the lawful owner of the Bleeker St. Note and that the defense of the lack of mutuality, each of which the court has decided adversely to Carlyle. Thus, having ruled that Carlyle's debts under the Bleeker St. Note and Carlyle's claims against the Plans are mutual, and having further determined that the Plans themselves contain no contractual prohibition against the exercise of offset, the court therefore holds that NSDC, pursuant to 11 U.S.C. § 553 and applicable law, is entitled to exercise a right of offset and enjoys the rights of a secured creditor in respect to the amounts NSDC owes Carlyle under the Plans.

V

Is NSDC Entitled To Relief
From the Automatic Stay Pursuant
To 11 U.S.C. § 362(d)(1) or
11 U.S.C. § 362(d)(2)?

■ While section 553 of the Bankruptcy Code preserves the right of setoff as it may exist prepetition, once a bankruptcy petition is filed, a creditor's right of setoff is subject to the automatic stay. *See* 11 U.S.C. § 362(a)(7) (1994); *Thompson v. Board of Trustees (In re Thompson)*, 182 B.R. 140, 146 (Bankr.E.D.Va.1995). NSDC seeks relief from the automatic stay pursuant to subsections (d)(1) and (d)(2) of Section 362 of the Bankruptcy Code.[13] Carlyle defends against the granting of relief on several bases: (i) Carlyle's equity in the Plans exceeds the debt owed under the Bleeker St. Note; (ii) the amounts Carlyle

receives under the Plans are necessary to his effective reorganization, and (iii) NSDC is adequately protected because, again, the amount owed Carlyle under the Plans exceeds the indebtedness owed to NSDC.

At the final hearing on the motion for relief, little evidence was adduced on these issues. Cotter testified that the Retirement Plan benefits were payable to Carlyle until his death, whereas the two deferred compensation plans were payable for fixed terms. Cotter's testimony is confirmed by a review of the Plans exhibited in the Stipulation. It is apparently undisputed that under Deferred Compensation Plan No. 1, Carlyle is entitled to receive $3,333.33 per month for 79 more months and under Deferred Compensation Plan No. 2, Carlyle is entitled to receive payments of $1,250.00 for 19 more months.

Carlyle, both in his memorandum of law submitted to the court and in his counsel's argument at the final hearing, asserts that he has equity in the Plans by reason of his calculation of the alleged present value of the two deferred compensation plans. Carlyle calculates the present value of his benefits under the Retirement Plan utilizing a table of life expectancy issued by the Internal Revenue Service and an assumed discount rate of 6.23 percent. Carlyle did testify he will not be able to successfully reorganize without the benefit of the payments under the Plans.

■ The minimal evidence introduced on these issues requires reference to Carlyle's and NSDC's respective burdens of proof. Under 11 U.S.C. § 362(g), the par-

---

**13.** Section 362(d) of the bankruptcy code provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization . . .

11 U.S.C. § 362(d)(1) & (2) (1994).

ty requesting relief has the burden of proof on the issue of equity and the party opposing relief has the burden on all other issues. *See* 11 U.S.C. § 362(g) (1994). NSDC, with respect to the grounds for relief from the automatic stay prayed for under section 362(d)(1), has failed to produce sufficient evidence to carry its burden of proof on the issue as to the lack of equity of Carlyle in the Plans. Furthermore, Carlyle's uncontradicted testimony is that the payments owed him under the Plans are necessary for his effective reorganization. Accordingly, relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) is denied.

▇▇▇ However, Carlyle has also failed in carrying his burden of proof that NSDC is adequately protected. Carlyle has offered no adequate protection to NSDC other than his contention that there is equity in the Plans over and above the amount owed under the terms of the Bleeker Street Note. While his calculations of the present value of his benefits under the Plans may be reasonable, Carlyle elected to offer no evidence whatsoever at the final hearing in this regard. There is no basis then for the court to measure whether his assumption-based calculations are cogent or not.

Carlyle has failed to carry his burden of proof on the issue of adequate protection and the court finds NSDC is entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2).

## VI

### Is NSDC Obligated To Withhold Applicable Federal and State Income Taxes from the Amounts NSDC Previously Setoff?

▇▇▇ Carlyle finally argues that NSDC is obligated to withhold federal and state

income taxes from the amounts both offset previously and as offset in the future by NSDC from the amounts due to Carlyle under the terms of the Plans. In support of this proposition. Carlyle relies on this court's decision in *In re Blanton*. There, it was found that the deferred compensating plans in question provided that "[a]ll payments pursuant to this Plan should be reduced by the amount of applicable federal, state and local withholding taxes." *Id.* at 329. The court also accepted evidence as to the debtor's various Internal Revenue Service Form W–4. Employee's Withholding Allowance Certificates ("W–4") which had been filed with his employer and the amounts the employer had previously withheld and remitted to the taxing authorities. Relying on the express plan language and 26 U.S.C. § 3402, which requires an employer to withhold income taxes from an employee in accordance with a filed W–4, the court found a fiduciary duty existed on the part of the employer to the debtor. The court further found that the employer breached its duty by failing to withhold sufficient income tax for the debtor to pay his full federal tax liability on the withdrawal from the deferred compensation plans. *Id.* at 350.

This Court in the instant matter is hampered by the absence of the proffer of any evidence on the circumstances of the tax withholdings or lack thereof. There is nothing in the record created at the final hearing on NSDC's motion for relief to advise the court as to whether any prior withholding of federal or state taxes from monies paid or due to Carlyle, either before or after NSDC made the offset.[14] Similarly, there is no evidence as to whether Carlyle ever requested or demanded withholding heretofore or has ever filed a W–4 with NSDC, nor is there any basis to conclude whether Carlyle has experienced

14. The Stipulation states that NSDC offset the payments under the Plans from January 1999 through July 1999. While this language suggests all of the payments were offset, the Court can only surmise whether withholding was done or not.

any ultimate tax liability as a result of any offset distributions from the Plans. The language of the Plans here is also not as specific nor express as the plan provisions relied on in *In re Blanton.* Apparently, only deferred compensation plan No. 2 has any reference to suggest an obligation to withhold any payments in its provision in section 6–8 which requires NSDC to withhold from payments made to a participant "such amounts as may be required by law." [15]

With either no applicable plan provision or the nonspecific provision concerning withholding found in deferred compensation plan No. 2 here, combined with the introduction of no evidence at the final hearing on the motion for relief from which the court may make any findings as to withholding or tax liability on the part of Carlyle, the court must conclude it has no basis to order any withholding from amounts previously offset by NSDC from amounts owed to Carlyle under the Plans. With respect to future amounts which NSDC may offset, the Court believes 26 U.S.C. § 3402 and § 3405 require withholding of income taxes, including applicable FICA and FUTA taxes, from the amounts NSDC sets off as if such offsets were wages. Withholding shall be in accordance with the most recent W–4, if any, Carlyle filed with NSDC.[16] NSDC shall similarly withhold and pay all applicable state withholding taxes.

## CONCLUSION

For the reasons stated herein, it is ORDERED that NSDC's Motion for Relief

from Automatic Stay is GRANTED. NSDC is ORDERED, with respect to any future amounts it may choose to setoff, under the Plans, to satisfy the Bleeker St. note, to withhold income and other applicable employment taxes from those offsets and to pay them in accordance with applicable law.

It is further ORDERED that the Clerk shall forward a copy of this Memorandum Opinion and Order to Paul K. Campsen, counsel for Norshipco; to C. Grigsby Scifres, counsel for Carlyle; and to Robert B. VanArsdale, Office of the United States Trustee.

15. Besides meeting the requirements of 26 U.S.C. § 3402, employers must withhold applicable federal withholding, FICA and FUTA taxes on distributions made under deferred compensation plans as they would wages. *See* 26 U.S.C. § 3405(a)(1) (1994), 3121(v)(2) (1994), & 3306(r)(2) (1994). While Section 6672 of the Internal Revenue Code imposes personal liability on individuals who willfully fail to properly withhold such taxes and courts have found that people or entities responsible for withholding taxes have a fiduciary duty to the Internal Revenue Service to properly withhold, *see Hornsby v. IRS,* 588 F.2d 952, 953 (5th Cir.1979), the Court has

found no reported cases, and Carlyle points to none, that find an employer has a fiduciary duty to an employee to withhold taxes. The court expressly declines to find the existence of any fiduciary duty on NSDC to Carlyle concerning the necessity of withholding any amounts due by reason of federal or state taxes.

16. 26 U.S.C. § 3402(f)(4) provides an employee's form W–4 remains in effect until replaced by another certificate.